[No. S044184. Dec. 23, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ROCHELLE LONEL GARDELEY et al., Defendants and Appellants.

**COUNSEL**

Janice M. Lagerlof and John M. Hanley, under appointments by the Supreme Court, for Defendants and Appellants.

John T. Philipsborn as Amicus Curiae on behalf of Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Mark S. Howell, Allan Yannow, Ann K. Jensen and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—At issue in this case are certain provisions of the Street Terrorism Enforcement and Prevention Act, also known as the STEP Act, enacted by the Legislature in 1988. (Pen. Code, § 186.20 et seq.) Underlying the STEP Act was the Legislature's recognition that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." (Pen. Code, § 186.21.) The act's express purpose was "to seek the eradication of criminal activity by street gangs." (*Ibid.*)

As relevant here, the STEP Act imposes certain penal consequences when crimes are committed "for the benefit of, at the direction of, or in association

with any *criminal street gang.*" (Pen. Code, § 186.22, subd. (b)(1), italics added.) A "criminal street gang," as defined by the act, is any ongoing association of three or more persons that shares a common name or common identifying sign or symbol; has as one of its "primary activities" the commission of specified criminal offenses; and engages through its members in a *"pattern of criminal gang activity."* (*Id.*, subd. (f), italics added.) Under the act, "pattern of criminal gang activity" means that gang members have, within a certain time frame, committed or attempted to commit "two or more" of specified criminal offenses (so-called "predicate offenses"). (Pen. Code, § 186.22, subd. (e).)[1]

Here, based on the jury's determination that the prosecution had satisfied the STEP Act requirements, the trial court imposed increased sentences as to both defendants. The Court of Appeal, however, struck the sentence enhancements on the ground that the prosecution had failed to prove the requisite "pattern of criminal gang activity." The Court of Appeal held that evidence of "two or more" predicate offenses by gang members can establish a "pattern of criminal gang activity" only if each such offense is shown to be "gang related." We disagree that the predicate offenses must be "gang related." We also disagree with the Court of Appeal's conclusion that the prosecution failed to prove the requisite pattern of criminal gang activity.

I

On August 4, 1992, about 2 a.m., Edward Bruno was riding in a car with some friends. Bruno, who had been drinking, needed to urinate. The car stopped near Farm Drive and Old Hillsdale Avenue in San Jose. While Bruno was relieving himself in the carport of an apartment complex, which happened to be in an area controlled by the Family Crip gang, he was approached by defendants Rochelle Lonel Gardeley and Tommie James Thompson, and one Tyrone Dermont Watkins. Gardeley shoved Bruno and asked, "What are you doing here, white boy?" Bruno pushed Gardeley back and punched him. Someone then hit Bruno in the head. When Bruno tried to get away, the three men pursued him. They knocked Bruno to the ground, repeatedly punched and kicked him, hit his thighs and rib cage with a bat or stick, and broke a large rock into pieces on his head. Taken from Bruno were

---

[1]We use the term "predicate offenses" throughout this opinion to describe the component crimes that constitute the statutorily required "pattern of criminal gang activity." We agree with the following observation by the Court of Appeal in *People* v. *Olguin* (1994) 31 Cal.App.4th 1355, 1383, footnote 13 [37 Cal.Rptr.2d 596], as to using the term "predicate offenses" to describe the crimes that establish a "pattern of criminal gang activity": "While the statute does not use the word 'predicate' it has become the accepted usage for reference to the statutorily required offenses. This is unfortunate since it implies precedence, which . . . is not a requirement, but it seems too well entrenched in the case law to change now."

a wristwatch, a gold neck chain, and $30. Bruno suffered an eye injury and multiple bruises, and required 20 stitches to his forehead. Apartment residents who witnessed the attack called the police. Minutes later, police officers stopped a car for speeding and making an illegal U-turn, and recovered from the ground outside the passenger door a plastic "baggie" containing .99 grams of cocaine. The driver of the car was defendant Thompson, and the passenger was defendant Gardeley, who had a bloody lip and blood on his T-shirt and arm.

Gardeley and Thompson were charged with attempted murder (Pen. Code, §§ 664 and 187);[2] assault with a deadly weapon, with a great bodily injury enhancement (§§ 245, subd. (a)(1)), 12022.7); and robbery (§ 211). Each of these offenses was alleged to have been committed "for the benefit of, at the direction of, or in association with [a] criminal street gang" (§ 186.22, subd. (b)(1)). Both defendants were also charged with a fourth offense, committing an assault (§ 240) and/or battery (§ 242) "for the benefit of, at the direction of, or in association with, [a] criminal street gang" (§ 186.22, former subd. (c), as amended by Stats. 1991, ch. 661, § 1; all references to "former subdivision (c)" are to this version); additionally, defendant Gardeley was charged with possession of cocaine (Health & Saf. Code, § 11350, subd. (a)).[3]

At trial, the prosecution presented evidence regarding the attack on Edward Bruno. Thereafter, the prosecution called as a witness Detective Patrick Boyd of the San Jose Police Department, who had 23 years of experience in the investigation of criminal street gangs. Boyd had interviewed both defendants after their arrests in this case.[4] Defendant Gardeley said that he had been a member of the Family Crip gang since 1983 and was known by the moniker or street name of "Trench." Defendant Thompson stated that he too was a Family Crip member and was known as "Capone." According to Thompson, the gang had approximately 70 active members. He admitted that he had been dealing cocaine at the apartment complex just before the confrontation with Bruno.

In the course of his testimony, Detective Boyd mentioned that he had also interviewed Tyrone Watkins, Bruno's third assailant. When the prosecutor

---

[2]Further undesignated statutory references are to the Penal Code.

[3]For his part in the attack on Bruno, Tyrone Watkins was charged together with defendants Gardeley and Thompson. Before trial, however, Watkins entered guilty pleas to assault with a deadly weapon (§ 245) and committing a crime for the benefit of a criminal street gang (§ 186.22, former subd. (c)).

[4]Detective Boyd advised defendants of their constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726-727, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and they agreed to talk to him.

then asked what Watkins had told Boyd, counsel for defendant Thompson objected on hearsay grounds. As an offer of proof, the prosecutor explained that he sought to elicit from Detective Boyd the statements made by Watkins, not "for the truth of the matter asserted," but to put before the jury facts on which Boyd could rely in rendering his expert opinion that the attack on Bruno "was gang activity in furtherance of . . . the Family Crip gang." The prosecutor added that he also intended to ask Detective Boyd "hearsay questions" about some prior criminal acts involving members of the Family Crip gang.

Out of the jury's presence, the trial court held a hearing to allow the prosecution to make an offer of proof regarding the statements by Watkins and the other "hearsay" evidence that it intended to present. At the hearing, Detective Boyd provided additional details of his familiarity with the criminal activities of the Family Crip gang. Thereafter, the trial court ruled that Boyd could testify as an expert on criminal gang activity.

In the jury's presence, the trial court overruled defendant Thompson's hearsay objection to the questions the prosecutor asked Detective Boyd about the Tyrone Watkins interview. The court then informed the jury that certain "hearsay" would be introduced pertaining to Tyrone Watkins and other matters, but that the jury "may not consider those [hearsay] statements for the truth of the matter, but only as they give rise . . . to the expert opinion in which questions will be asked which will follow." Immediately thereafter Detective Boyd testified that Tyrone Watkins had said that his street name was "T-Bone," and that he had been a member of the Family Crip gang since 1988. Boyd added that several other individuals had also admitted to him their membership in the Family Crip gang.

The prosecutor asked Detective Boyd for his opinion as to the primary purpose or activity of the Family Crip gang. Detective Boyd responded that based on investigations of hundreds of gang-related offenses, conversations with defendants and other Family Crip members, as well as information from fellow officers and various law enforcement agencies, it was his opinion that the Family Crip gang's primary purpose was to sell narcotics, but that the gang also engaged in witness intimidation and other acts of violence to further its drug-dealing activities.

The prosecutor then gave Detective Boyd this scenario: "Assuming hypothetically that we have an incident that took place at about 2:00 a.m. on [Old] Hillsdale and Farm [in San Jose] in which Family Crip gang members were present and one of which is out attempting to sell cocaine and a second is found with cocaine near his possession when detained, and a white male is

observed urinating in this area and a fight breaks out with the white male and then the white male is chased down by the three Family Crip gang members, severely beaten, threatened, they said they were gonna kill him, then he is robbed of money, necklace and a watch." The prosecutor asked whether in Detective Boyd's expert opinion the attack on the White male as just described was "gang related activity." Boyd replied that it was, calling it a "classic" example of how a gang uses violence to secure its drug-dealing stronghold.

Detective Boyd explained: It is common practice for several gang members acting in concert to assault a person in full view of residents of an area where the gang sells drugs. Such attacks serve to intimidate the residents and to dissuade them from reporting the gang's drug-dealing activities to police. Gang members typically view a dispute or argument with someone who is not a member of the gang as a "challenge" to the gang's authority, and they respond by trying to "dominate" the person physically, that is, they might "beat the person senseless, throw rocks over his head, kick him" and do this "where a lot of people can witness it." When gang members "terrorize people . . . [who] have to live there," the "fear factor" allows the gang to "go right back to dope dealing" day after day in the same area.

Thereafter, the prosecutor questioned Detective Boyd regarding three separate criminal incidents. The most recent of the three was a May 2, 1992, shooting at an apartment complex involving defendant Thompson and one Mario Phipps, who Boyd confirmed was a Family Crip member. The second incident took place on July 17, 1989, in San Jose; it involved a threat against a drug dealer, Michael Halliburton, by defendant Gardeley and three other persons, who Detective Boyd knew to be members of the Family Crip gang. The third incident occurred on December 1, 1987, when two police officers observed defendant Gardeley and others in the vicinity of Nancy Lane and Florence in San Jose flagging down cars in a manner that the officers associated with the sale of narcotics; Gardeley fled, but when stopped by the officers was found to be in possession of crack cocaine. In the expert opinion of Detective Boyd, each of the three incidents just described was "gang related" criminal activity of the Family Crip gang.

The prosecutor then offered into evidence, without objection by the defense, certified copies of three informations, together with abstracts of judgment and other official court records. The first information charged Mario Phipps (not a defendant in this case) with a May 2, 1992, shooting at an occupied dwelling with a shotgun (§ 246); the second information charged defendant Gardeley with a July 17, 1989, incident of being an accessory to a felony (§ 32); and the third information charged defendant

Gardeley with a December 1, 1987, incident of cocaine possession (Health & Saf. Code, § 11350). The abstracts of judgment and other court records documented the convictions of Mario Phipps and of defendant Gardeley for the offenses charged in these three informations.

The jury convicted defendants Gardeley and Thompson of attempted murder (§§ 664 and 187), and of assault with a deadly weapon with great bodily injury (§§ 245, subd. (a)(1), 12022.7), and found true the allegations that the offenses had been committed "for the benefit of, at the direction of, or in association with [a] criminal street gang" (§ 186.22, subd. (b)(1)). The jury also convicted both defendants of committing assault and/or battery "for the benefit of, at the direction of, or in association with, [a] criminal street gang" (§ 186.22, former subd. (c)), and in addition convicted defendant Gardeley of possession of cocaine (Health & Saf. Code, § 11350, subd. (a)).[5] The trial court sentenced both defendants to state prison, Gardeley for 17 years, and Thompson for 9 years.[6] Both defendants appealed.

The Court of Appeal reversed the convictions under former subdivision (c) of section 186.22 (committing an assault and/or battery "for the benefit of, at the direction of, or in association with, [a] criminal street gang"), and struck the criminal street gang sentence enhancements that the trial court had imposed under subdivision (b)(1) of section 186.22, concluding that the prosecution had failed to prove the statutorily required "two or more" predicate offenses to establish that the Family Crip gang was a criminal street gang within the meaning of the statute; in all other respects, the court affirmed the judgments. The Court of Appeal reasoned that the prosecution had to prove not only the statutory requirements pertaining to predicate offenses, but also that each such offense was "gang related." According to the Court of Appeal, Detective Boyd's expert opinion testimony that the three separate criminal incidents (involving defendants Gardeley and Thompson and other Family Crip members and committed before the charges in this case) were "gang related" was not competent evidence on the issue because Boyd's opinion was not based on facts in evidence and Boyd had no personal knowledge of the facts underlying the three incidents.

We granted the Attorney General's petition for review.

---

[5]Bifurcated from the jury trial were allegations that defendant Gardeley had served a prior prison term (§ 667.5) and had suffered a previous conviction for a serious felony (§§ 667/ 1192.7). The trial court found both allegations to be true.

[6]Defendant Gardeley's seventeen-year prison term was comprised of nine years for attempted murder, two years concurrent for cocaine possession, a five-year serious felony enhancement, a one-year prior prison term enhancement, and a two-year "street gang" enhancement. Defendant Thompson's nine-year prison term consisted of seven years for attempted murder and a two-year "street gang" enhancement. For both defendants, the trial court stayed imposition of sentence for the violations of former subdivision (c) of section 186.22 (assault and/or battery "for the benefit of, at the direction of, or in association with" a criminal street gang).

## II

As mentioned at the outset, the Legislature in 1988 enacted the Street Terrorism Enforcement and Prevention Act, also known as the STEP Act. (§ 186.20 et seq.) As relevant here, the STEP Act prescribes certain penal consequences for crimes committed "for the benefit of, at the direction of, or in association with" a criminal street gang. (§ 186.22.) Underlying the enactment of this statutory scheme was a legislative finding declaring that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." (§ 186.21.) To combat the problem, the Legislature declared its intent "to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs." (*Ibid.*)

Defendants in this case were charged under subdivision (b)(1) and former subdivision (c) of section 186.22. Because the crimes in this case took place in August 1992, we consider the version of the statutory provisions then in effect. (Stats. 1991, ch. 661, § 1; see No. 5, 1991 Deering's Adv. Legis. Service, pp. 2751-2752.) At that time, as it does now, subdivision (b)(1) provided for "an additional term of one, two, or three years at the court's discretion" to be imposed on a defendant for any felony "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) And former subdivision (c) provided: "Any person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of, or in association with, any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison for one, two, or three years, provided that any person sentenced to imprisonment in the county jail shall be imprisoned for a period not to exceed one year, but not less than 180 days, and shall not be eligible for release upon the completion of sentence, parole, or any other basis, until he or she has served 180 days."[7] (§ 186.22, former subd. (c).)

Under either provision, the offense of which the defendant is convicted in the present case must have been "committed for the benefit of, at the

---

[7]Since its enactment, the STEP Act has been amended almost every year, sometimes several times in a year. In the version of section 186.22 in effect as of January 1, 1996 (Stats. 1995, ch. 377, § 2), subdivision (b)(1) remains essentially unchanged. Accordingly, our holding here is not limited to cases brought under the 1991 version of subdivision (b)(1) of section 186.22. Subdivision (c), however, has been changed in its entirety and now states: "If the court grants probation or suspends execution of sentence imposed upon the defendant for violation of subdivision (a), or in cases involving a true finding of the enhancement

direction of, or in association with any *criminal street gang*" and the defendant must have committed the offense with "the specific intent to promote, further, or assist in any criminal conduct" by members of the street gang. (§ 186.22, subd. (b)(1); *id.*, former subd. (c), italics added.) As we noted at the outset, subdivision (f) of section 186.22 defines the term "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" criminal acts enumerated in subdivision (e) of the statute,[8] and which has "a common name or common identifying sign or symbol, [and] whose members individually or collectively engage in or have engaged in a *pattern of criminal gang activity*." (Italics added.) Subdivision (e) of section 186.22 defines the phrase "pattern of criminal gang activity" as "the commission, attempted commission, or solicitation of *two or more*" (italics added) of the offenses enumerated in that subdivision "provided at least one of those offenses occurred after the effective date of this chapter [September 26, 1988,] and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions, or by two or more persons."

To summarize, to subject a defendant to the penal consequences of the STEP Act, the prosecution must prove that the crime for which the defendant

enumerated in subdivision (b), the court shall require that the defendant serve a minimum of 180 days in a county jail as a condition thereof." (§ 186.22, subd. (c).)

In this case, the charging documents treated section 186.22, former subdivision (c) as a substantive offense. Because former subdivision (c) is no longer a part of the STEP Act, we need not decide whether that former provision created a substantive criminal offense or was only a penalty provision. (See e.g., *People* v. *Bright* (1996) 12 Cal.4th 652 [49 Cal.Rptr.2d 732, 909 P.2d 1354].) Defendants argue that *In re Estrada* (1965) 63 Cal.2d 740, 748 [48 Cal.Rptr. 172, 408 P.2d 948] mandates reversal of their convictions for violating former subdivision (c). The People concede that the 1994 amendments to the STEP Act repealed that former provision, but argue the repeal was inadvertent, and that *Estrada*'s rule of abatement, therefore, does not apply. As earlier noted, for both defendants, the trial court stayed imposition of sentence on the violations of former subdivision (c). We decline to address the issue. (Cal. Rules of Court, rule 29.2(a).)

[8]The version of subdivision (e) of section 186.22 in effect at the time here relevant (Stats. 1991, ch. 661, § 1) listed these criminal offenses:

"(1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245.

"(2) Robbery, as defined in Chapter 4 (commencing with Section 211) of Title 8 of Part 1.

"(3) Unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1.

"(4) The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances as defined in Sections 11054, 11055, 11056, 11057, and 11058 of the Health and Safety Code.

"(5) Shooting at an inhabited dwelling or occupied motor vehicle, as defined in Section 246.

"(6) Arson, as defined in Chapter 1 (commencing with Section 450) of Title 13.

"(7) The intimidation of witnesses and victims, as defined in Section 136.1.

"(8) Grand theft of any vehicle, trailer, or vessel as described in Section 487h."

was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1) and former subd. (c).) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e) and (f).)

In the sections that follow, we explain how the prosecution here satisfied these statutory requirements.

## III

We first consider the issue of gang expert testimony, which in this case was given by Detective Patrick Boyd of the San Jose Police Department.

California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801). ██ ██ Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*Id.*, subd. (a).) The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion. (*People* v. *Olguin, supra*, 31 Cal.App.4th 1355, 1370 ["The use of expert testimony in the area of gang sociology and psychology is well established."]; *People* v. *Gamez* (1991) 235 Cal.App.3d 957, 965-966 [286 Cal.Rptr. 894] [upholding the admission of opinion testimony by a gang expert]; *People* v. *McDaniels* (1980) 107 Cal.App.3d 898, 904-905 [166 Cal.Rptr. 12] [same]; see *People* v. *Champion* (1995) 9 Cal.4th 879, 919-922 [39 Cal.Rptr.2d 547, 891 P.2d 93] [holding that opinion testimony by an expert in juvenile gangs was relevant and therefore admissible].)

Evidence Code section 801 limits expert opinion testimony to an opinion that is "[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . ." (*Id.*, subd. (b).)

■ Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." (1 McCormick on Evidence (4th ed. 1992) § 14, p. 58.) Such a hypothetical question must be rooted in facts shown by the evidence, however. (*Rowe* v. *Such* (1901) 134 Cal. 573, 576 [66 P. 862]; *People* v. *Castillo* (1935) 5 Cal.App.2d 194, 197-198 [42 P.2d 682]; accord, *Hyatt* v. *Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 339 [145 Cal.Rptr. 47]; see CALJIC No. 2.82.)

Expert testimony may also be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. (Evid. Code, § 801, subd. (b); *People* v. *Montiel* (1993) 5 Cal.4th 877, 918-919 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *Korsak* v. *Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524 [3 Cal.Rptr.2d 833]; *Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 923 [184 Cal.Rptr. 393].) Of course, any material that forms the basis of an expert's opinion testimony must be reliable. (1 Witkin, Cal. Evidence (3d ed. 1986) The Opinion Rule, § 477, p. 448.) For "the law does not accord to the expert's opinion the same degree of credence or integrity as it does the data underlying the opinion. Like a house built on sand, the expert's opinion is no better than the facts on which it is based." (*Kennemur* v. *State of California, supra,* at p. 923.)

So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. (*In re Fields* (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862] [expert witness can base "opinion on reliable hearsay, including out-of-court declarations of other persons"]; see Fed. Rules Evid., rule 703, 28 U.S.C.; 2 McCormick on Evidence, *supra*, § 324.3, pp. 372-373.) And because Evidence Code section 802 allows an expert witness to "state on direct examination the reasons for his opinion and the matter . . . upon which it is based," an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. (*People* v. *Shattuck* (1895) 109 Cal. 673, 678 [42 P. 315] [medical expert could testify to patient's complaints in order "to give a clinical history of the case to understand the significance of her symptoms"]; *McElligott* v. *Freeland* (1934) 139 Cal.App. 143, 157-158 [33 P.2d 430] [certified public accountant could testify to information he relied on in property valuation]; see *People* v. *Wash* (1993) 6 Cal.4th 215, 251 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [prosecution could elicit out-of-court statements relied on by the defense expert]; 2 McCormick on Evidence, *supra*, § 324.3, p. 372 [explaining that under rule 703, Fed. Rules Evid., which allows the expert to disclose to the trier of fact the basis for expert opinion,

"[t]he result is that often the expert may testify to evidence even though it is inadmissible under the hearsay rule."].)

A trial court, however, "has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay." (*People* v. *Price* (1991) 1 Cal.4th 324, 416 [3 Cal.Rptr.2d 106, 821 P.2d 610].) A trial court also has discretion "to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein." (*People* v. *Coleman* (1985) 38 Cal.3d 69, 91 [211 Cal.Rptr. 102, 695 P.2d 189].) This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into "independent proof" of any fact. (*Korsak* v. *Atlas Hotels, Inc., supra*, 2 Cal.App.4th at pp. 1524-1525, citing *Whitfield* v. *Roth* (1974) 10 Cal.3d 874, 893-896 [112 Cal.Rptr. 540, 519 P.2d 588]; Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness* (1986) U. Ill. L.Rev. 43, 66 ["evidence admitted solely to form the basis of an expert's opinion under [Federal Rules of Evidence] Rule 703 will not support a prima facie case"]; 2 McCormick on Evidence, *supra*, § 324.3, p. 373 and fn. 8 [same].)

Consistent with these well-settled principles, the trial court in this case ruled that Detective Boyd could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay.

After giving Detective Boyd a "hypothetical" based on the facts of the assault in this case on Edward Bruno by three Family Crip members, the prosecutor asked Boyd if in his expert opinion an attack as described would be "gang-related activity." Boyd responded that it was a "classic" example of gang-related activity, explaining that criminal street gangs rely on such violent assaults to frighten the residents of an area where the gang members sell drugs, thereby securing the gang's drug-dealing stronghold. From this expert testimony by Detective Boyd, the jury could reasonably conclude that the attack on Bruno by members of the Family Crip gang including defendants was committed "for the benefit of, at the direction of, or in association with" that gang, and "with the specific intent to promote, further, or assist in . . . criminal conduct by gang members" as specified in the STEP Act (§ 186.22, subd. (b)(1) and former subd. (c)).

Detective Boyd's testimony also provided much of the evidence necessary to establish that the Family Crip gang met the STEP Act's definition of a

"criminal street gang." (§ 186.22, subd. (f) [defining a criminal street gang as an "ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more" criminal acts enumerated in subdivision (e) of the statute, and which has a "common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."].)

Boyd testified that defendants Gardeley and Thompson admitted to membership in the Family Crips, and that Gardeley had been a member of the gang since 1983. Boyd also expressed his expert opinion that the primary activity of the Family Crip gang was the sale of narcotics, but that the gang also engaged in witness intimidation. (These are two of the offenses enumerated in subdivision (e) of section 186.22.) Boyd based this opinion on conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies.

We conclude that this testimony by Detective Boyd provided a basis from which the jury could reasonably find that the Family Crip gang met the requirements of subdivision (f) of section 186.22 for a criminal street gang: (1) an "ongoing organization, association, or group of three or more persons" (2) that shares "a common name or common identifying . . . symbol" and (3) that has "as one of its primary activities the commission of one or more" of the criminal acts enumerated in subdivision (e) of section 186.22 (namely, the sale of controlled substances (subd. (e)(4)) and witness intimidation (former subd. (e)(7), now subd. (e)(8)). Thus, through Detective Boyd's expert testimony, the prosecution satisfied most of the requirements of the STEP Act to prove that the Family Crip gang was a "criminal street gang." But the prosecution still had to establish the additional statutory requirement that the gang's members "individually or collectively engage in or have engaged in a pattern of criminal gang activity" (§ 186.22, subd. (f)), a point that we will discuss in the part that follows.

IV

Subdivision (e) of section 186.22 states: "As used in this chapter, 'pattern of criminal gang activity' means the commission, attempted commission, or solicitation of two or more of the following [enumerated] offenses, provided at least one of those offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions,

or by two or more persons." Thus, a gang otherwise meeting the *statutory* definition of a "criminal street gang" (see pt. III, *ante*, discussing the statutory requirements pertaining to a "criminal street gang"), is considered a criminal street gang under the STEP Act only if its members "individually or collectively engage in or have engaged in a pattern of criminal gang activity" (§ 186.22, subd. (f)) by "the commission, attempted commission, or solicitation of *two or more*" (italics added) of the statutorily enumerated offenses within the specified time frame (§ 186.22, subd. (e); see fn. 8, *ante*, listing the statutorily enumerated offenses). Defendants, however, read yet another requirement into the statute. They contend that the Legislature must have also intended that the "two or more" predicate offenses that are necessary to establish "a pattern of criminal gang activity" be "gang related." In other words, according to defendants, the prosecution must establish not only the requirements for predicate offenses set forth in the statute, but also that each such offense was committed *for the benefit of, at the direction of, or in association with the gang.* We disagree.

■ Our task in construing the STEP Act, as with any statute, is to ascertain and effectuate legislative intent. (*Hsu* v. *Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804]; *Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) We turn first to the words of the statute themselves, recognizing that "they generally provide the most reliable indicator of legislative intent." (*Hsu* v. *Abbara, supra,* at p. 871; *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) When the language of a statute is "clear and unambiguous" and thus not reasonably susceptible of more than one meaning, " ' " 'there is no need for construction, and courts should not indulge in it.' " ' " (*California Fed. Savings & Loan Assn.* v. *City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297]; *DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].)
■ Here, the relevant statutory language is clear and unambiguous. Section 186.22, subdivision (e) defines "pattern of criminal gang activity" as "the commission, attempted commission, or solicitation of two or more" enumerated offenses occurring within a specified time period, and "committed on separate occasions, or by two or more persons." Nothing in this statutory language suggests an intent by the Legislature to require the "two or more" predicate offenses to have been committed "for the benefit of, at the direction of, or in association with" the gang, as defendants contend.

Application of another principle of statutory construction lends support to our conclusion that the Legislature did not intend that the predicate offenses must be "gang related." When the Legislature has used a term or phrase in

one part of a statute but excluded it from another, courts do not imply the missing term or phrase in the part of that statute from which the Legislature has excluded it. (*Pasadena Police Officers Assn.* v. *City of Pasadena* (1990) 51 Cal.3d 564, 576 [273 Cal.Rptr. 584, 797 P.2d 608].) Here, the phrase *"for the benefit of, at the direction of, or in association with,"* which defendants would have us read into subdivision (e) of section 186.22, appears in subdivision (b)(1) of section 186.22. The latter provision states that, under certain conditions, a felony conviction qualifies as a street gang crime and hence is subject to increased punishment.[9] By inserting the italicized phrase in subdivision (b)(1), the Legislature made it clear that a criminal offense is subject to increased punishment under the STEP Act only if the crime is "gang related," that is, it must have been committed, in the words of the statute, "for the benefit of, at the direction of, or in association with" a street gang. Had the Legislature intended to impose this same requirement for the crimes in subdivision (e), it could have easily done so. It did not.

Defendants argue, however, that because the statute at issue is a *penal* statute, it must be construed in favor of defendants, necessitating reading into the statute the requirement that the predicate offenses comprising the statutorily required "pattern of criminal gang activity" be gang related. Defendants are wrong. Although it is the policy of this state to have courts construe penal laws as favorably to criminal defendants as reasonably permitted by the statutory language and circumstances of the application of the particular law at issue (*People* v. *Bland* (1995) 10 Cal.4th 991, 1001 [43 Cal.Rptr.2d 77, 898 P.2d 391]; *People* v. *Overstreet* (1986) 42 Cal.3d 891, 896 [231 Cal.Rptr. 213, 726 P.2d 1288]), that policy generally comes into play only when the language of the penal law "is susceptible of two constructions" (*People* v. *Overstreet, supra,* at p. 896), a situation not present here.

Defendants insist that even in the absence of legislative intent to limit the crimes that comprise the statutorily required "pattern of criminal gang activity" to those that are gang related, considerations of due process require this court to read such a limitation into subdivision (e) of section 186.22. In support, defendants cite *Lanzetta* v. *New Jersey* (1939) 306 U.S. 451 [83 L.Ed. 888, 59 S.Ct. 618]. In that case, the United States Supreme Court struck down on due process grounds a conviction obtained under a New Jersey statute that imposed criminal penalties for *membership* in a gang by any person " 'convicted at least three times of being a disorderly person, or . . . convicted of any crime in this or in any other State.' " (*Id.* at p. 452 [83 L.Ed. at pp. 889-890], quoting the New Jersey statute.) The New Jersey

---

[9]The Legislature also used the same phrase in former subdivision (c) of section 186.22, under which defendants in this case were also charged and convicted.

statute defined the gang in which membership was forbidden simply as "'consisting of two or more persons,'" a definition that the high court found to be "vague, indefinite and uncertain." (*Id.* at pp. 453, 458 [83 L.Ed. at pp. 890, 893].)

We have a different situation here. The STEP Act defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more criminal acts enumerated [in the statute], [and] having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) The act defines "pattern of criminal gang activity" as "the commission, attempted commission, or solicitation of two or more [enumerated offenses occurring within a specified time period] and . . . committed on separate occasions, or by two or more persons." (§ 186.22, subd. (e).)

Thus, to fall within the statutory definition of a "criminal street gang," there must be an ongoing association of at least three persons that has as one of its primary activities the commission of specific types of criminal activity, uses a common name or identifying sign or symbol, and has members who individually or collectively have actually engaged in "two or more" acts of specified criminal conduct committed either on separate occasions or by two or more persons. These detailed requirements of the STEP Act are sufficiently explicit to inform those who are subject to it what constitutes a criminal street gang for purposes of the act. (See *Lanzetta* v. *New Jersey*, *supra*, 306 U.S. at p. 453 [83 L.Ed. at p. 890].) In contrast, the New Jersey statute defined a gang merely by the phrase "consisting of two or more persons," a term so vague that persons of ordinary intelligence would necessarily have to guess at its meaning and application, because the statute brought within its range any noncriminal association or group. (*Id.* at pp. 453, 457 [83 L.Ed. at pp. 890, 892-893].)

There is yet another significant distinction that sets our statute apart from the New Jersey statute in *Lanzetta* v. *New Jersey*, *supra*, 306 U.S. 451. The New Jersey statute imposed criminal penalties for mere membership in a gang, condemning no act or omission. (*Id.* at p. 458 [83 L.Ed. at p. 893].) In contrast, our STEP Act does not criminalize mere gang membership; rather, it imposes increased criminal penalties only when the criminal conduct is felonious and committed not only "for the benefit of, at the direction of, or in association with" a group that meets the specific statutory conditions of a "criminal street gang," but also with the "specific intent to promote, further,

or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) These detailed requirements fully comport with due process.[10]

## V

■ Did the prosecution in this case prove the "pattern of criminal gang activity" as required by the statute? We conclude that it did.

Evidence of other crimes committed by members of the Family Crip gang included the following: informations and other official court records showing that defendant Gardeley was convicted for a July 17, 1989, incident of being an accessory to a felony (Pen. Code, § 32) and for a December 1, 1987, incident of cocaine possession (Health & Saf. Code, § 11350), and that one Mario Phipps (who Detective Boyd testified was a member of the Family Crip gang) was convicted for a May 2, 1992, shooting at an inhabited dwelling (Pen. Code, § 246). Of these incidents, only the last one involved the commission of one of the statutorily enumerated offenses necessary to comprise the requisite "two or more" offenses by gang members and establishing a pattern of criminal gang activity. (See § 186.22, subd. (e)(5) [listing as one such offense "Shooting at an inhabited dwelling or occupied motor vehicle, as defined in Section 246."].) Therefore, through the documentary evidence of Family Crip gang member Phipps's conviction for shooting at an inhabited dwelling, the prosecution established *one* of the necessary predicate offenses.[11] The prosecution proved the second requisite predicate offense through evidence in this case of the attack on Edward Bruno by defendants Gardeley and Thompson, as well as one Tyrone Watkins, all members of the Family Crip gang.

[10]In *People* v. *Gamez, supra,* 235 Cal.App.3d 957, 977-978, the Court of Appeal concluded that the crimes that make up the pattern of criminal street gang activity must be "gang related," reasoning that "[t]o allow otherwise would be to punish [a] defendant for the *unrelated* actions of people with whom he associated." (Original italics.) Here, the Court of Appeal followed *Gamez.* As we have explained, however, the STEP Act does not punish a defendant for the actions of associates; rather the act increases the punishment for a defendant who committed a felony to aid or abet criminal conduct of a group that has as a primary function the commission of specified criminal acts and whose members have actually committed specified crimes, and who acted with the specific intent to do so. We disapprove *Gamez* to the extent it conflicts with our decision in this case.

Because we conclude that the predicate offenses need not be gang related, we have no occasion to decide whether or not Detective Boyd's opinion testimony was competent evidence that each of the uncharged crimes was gang related.

[11]This court in *People* v. *Wheeler* (1992) 4 Cal.4th 284, 298 [14 Cal.Rptr.2d 418, 841 P.2d 938], quoting a comment by the California Law Revision Commission, stated that " 'a judgment that is offered to prove the matters determined by the judgment is hearsay evidence.' " We need not decide here whether the documentary evidence of the judgment of conviction suffered by Mario Phipps constituted hearsay evidence when the prosecution offered it to prove matters determined by that judgment (namely, that Phipps committed the crime of which he was convicted), for defendants raised no hearsay objection to this documentary evidence.

The evidence of the attack on victim Bruno (consisting primarily of testimony by percipient witnesses) showed that defendants Gardeley and Thompson and one Tyrone Watkins confronted Bruno as he was urinating in the carport of an apartment complex, knocked him to the ground, repeatedly punched and kicked him, hit his thighs and rib cage with a bat or stick, and broke a large rock into pieces on his head. Detective Boyd, a gang expert, testified that defendants admitted to membership in the Family Crip gang. Considered together, this evidence was sufficient to establish not only the *commission* by gang members of assault with a deadly weapon, but also the *attempted commission* by gang members of murder. (§ 186.22, subd. (e) [stating that "'pattern of criminal gang activity' means the commission, attempted commission, or solicitation of two or more [enumerated] offenses" and listing among those enumerated offenses: "(1) Assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in Section 245"; and "(3) Unlawful homicide or manslaughter, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1."].)

Considering both the evidence of the attack in this case on victim Bruno by Family Crip gang members, as well as the documentary evidence of the conviction of Mario Phipps for shooting at an inhabited dwelling (testimony by Detective Boyd established Phipps's membership in the Family Crip gang), we conclude that the prosecution established the requisite "pattern of criminal gang activity" consisting of "two or more" statutorily enumerated offenses that were "committed on separate occasions, or by two or more persons." (See *People* v. *Olguin, supra,* 31 Cal.App.4th 1355, 1383 [holding the charged offenses can be considered in deciding upon the existence of a pattern of criminal gang activity]; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1462 [282 Cal.Rptr. 75] [same]; *In re Lincoln L.* (1990) 223 Cal.App.3d 322, 328 [272 Cal.Rptr. 852] [same]; accord, *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003 [279 Cal.Rptr. 236].)[12]

Subdivision (e) of section 186.22 additionally requires, however, that of the requisite "two or more" predicate offenses, "at least one . . . occurred after the effective date of this chapter [September 26, 1988,] and the last of those offenses occurred within three years after a prior offense." These requirements are satisfied here, as shown below.

---

[12]Our holding here that the "two or more" statutorily enumerated offenses that establish the "pattern of criminal gang activity" described in section 186.22, subdivision (e) need not be "gang related" does not absolve the prosecution of proving that the charged offense is gang related. (§ 186.22, subd. (b)(1) [providing enhanced penalties only for crimes committed "for the benefit of, at the direction of, or in association with" the gang].) Thus whenever the prosecution relies on the charged offense to establish one of the "two or more" offenses necessary to show a pattern of criminal gang activity (§ 186.22, subd. (e)), the prosecution must prove that the offense was gang related.

The attack on Edward Bruno by defendants and fellow Family Crip member Tyrone Watkins took place on August 4, 1992, whereas the shooting at an inhabited dwelling by one Mario Phipps (also a Family Crip member) was on May 2, 1992. Thus, all of the offenses that establish the statutorily required "pattern of criminal gang activity" in this case occurred after the September 26, 1988, effective date of the STEP Act. The evidence presented also meets the statutory requirement that "the last of those offenses [that is, those committed on August 4, 1992, during the attack on Edward Bruno] occurred within three years after a prior offense [that is, the May 2, 1992, shooting incident by Mario Phipps]." Accordingly, the prosecution presented sufficient evidence of the required predicate offenses to establish a pattern of criminal gang activity under the STEP Act.

## Conclusion

Through a combination of expert opinion testimony, documentary evidence of an uncharged crime, and testimony by percipient witnesses to the charged crimes in this case, the prosecution in this case met its burden of proving each of the several elements set forth by the Legislature in the Street Terrorism Enforcement and Prevention Act (also known as the STEP Act). Accordingly, for their roles in the brutal attack on Edward Bruno, Family Crip gang members Gardeley and Thompson are appropriately subject to the penal consequences of the STEP Act. We therefore reverse the judgment of the Court of Appeal insofar as it set aside defendants' convictions under former subdivision (c) and struck the increased prison terms imposed under subdivision (b)(1) of section 186.22.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellants' petitions for a rehearing were denied February 19, 1997, and the opinion was modified to read as printed above.