[No. D043058. Fourth Dist., Div. One. Aug. 12, 2005.]

ROBERT E. MILHOUS et al., Plaintiffs and Respondents, v. FRANCHISE TAX BOARD, Defendant and Appellant.

**COUNSEL**

Bill Lockyer, Attorney General, W. Dean Freeman and Leslie Branman-Smith, Deputy Attorneys General, for Defendant and Appellant.

Bewley, Lassleben & Miller, Kevin P. Duthoy, Joseph A. Vinatieri, Jason C. Demille, Jeffrey S. Baird; Law Offices of Paul D. Draper and Paul D. Draper, for Plaintiffs and Respondents.

OPINION

**BENKE, J.**—In this tax case plaintiffs and respondents paid taxes assessed by defendant and appellant Franchise Tax Board (the FTB) on income from a covenant not to compete. After paying the assessed taxes, plaintiffs brought this action for a refund. The trial court found that the covenant not to compete had no value in California and produced no income attributable to California.

For the first time on appeal, the FTB argues that because plaintiffs did not pay the interest due on the assessed taxes, as well as the taxes themselves, the trial court had no subject matter jurisdiction over plaintiffs' case. While it is true that in tax cases California has adopted the "pay first, litigate later" rule (see Cal. Const., art. XIII, § 32; Rev. & Tax. Code,[1] § 19382), that rule does not govern the trial court's subject matter jurisdiction but instead is a procedural condition on the refund remedy which, if not asserted, is waived. Thus, even if we accept the FTB's contention that by amendment to the code the Legislature could and did include interest within the taxes which must be paid before a refund action can be commenced, the FTB may not raise this argument for the first time on appeal.

The trial court's determination that the covenant not to compete had no value in California which would support California's right to tax payments generated by the covenant is supported by substantial evidence and is consistent with constitutional considerations governing the tax treatment of intangibles.

Accordingly, we affirm the trial court's judgment.

## SUMMARY

In the late 1960's, while still residents of California, plaintiffs Robert E. Milhous and Paul B. Milhous purchased an advertising business known as Treasure Chest Advertising Company, Inc. (Treasure Chest). The Milhouses developed Treasure Chest into a business which specialized in printing circulars, flyers and advertising inserts for newspapers. In 1973 they incorporated Treasure Chest as a California corporation.

In 1987 Treasure Chest was reorganized as a Delaware corporation, with its headquarters in Glendora, California. In 1988 the Milhouses moved to Florida, where they have maintained their residency. By the 1980's Treasure

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

Chest was largely run by a professional management team the Milhouses had retained.

In 1993 Treasure Chest sold its assets to another corporation, TCA. At that point Treasure Chest was the largest printer of advertising circulars, Sunday comics and TV listings in the western United States. Treasure Chest provided inserts for 100 percent of the newspapers in California and 85 percent of the newspapers west of the Rocky Mountains. Treasure Chest had 20 percent of the business east of the Rocky Mountains. Treasure Chest operated 13 printing presses to service its business.

Through a number of family trusts the Milhouses controlled 76 percent of the shares of Treasure Chest at the time of the sale. TCA paid a total of $120 million for Treasure Chest's assets. TCA attributed $30 million of the amount it paid to a covenant not to compete which the Milhouses executed. The covenant prevented the Milhouses from going to work for any competitor of Treasure Chest, revealing any trade secrets or confidential information of the corporation, hiring any Treasure Chest employees, or investing in any competitor. The covenant had a five-year term and covered all of the United States, Canada and Mexico.

In 1996 the FTB completed an audit and determined that the income the Milhouses received from the covenant was in part attributable to activities in California and therefore in part taxable as California income. In particular, the FTB found that because Treasure Chest had reported that 25.0538 percent of its income was attributable to California activities, 25.0538 percent of the income the Milhouses received from the covenant not to compete should be attributed to California.

The Milhouses sought administrative review of the assessment before the State Board of Equalization, which agreed with the FTB.

On January 31, 2001, and February 5, 2001, the Milhouses paid the FTB the total assessed taxes of $898,000. The Milhouses did not pay any accrued interest on the taxes. The Milhouses then made claims for refunds, which were denied.

The Milhouses filed suit in superior court demanding that the amounts that they paid be refunded.[2] After the trial court denied the parties' cross-motions for summary judgment, the case went to trial.

---

[2] The Milhouses and their respective spouses, Gale P. Milhous and Mary A. Milhous, were named plaintiffs. All further references to the Milhouses include Gale P. Milhous and Mary A. Milhous.

At trial the Milhouses relied upon the testimony of an economist, Dr. Alan Shapiro. He testified that because Treasure Chest had 100 percent of the market in California at the time of the sale, the covenant had no value in California. He concluded that, given the narrow profit margins of the business and the large investment in capital needed to acquire the printing presses used in the business, it would not be practical for anyone to attempt to compete with Treasure Chest in California.

The FTB relied upon Treasure Chest's apportionment of 25.0538 percent of its income to California in arguing that the covenant not to compete should be apportioned on the same basis. Treasure Chest's apportionment was done by application of the Uniform Division of Income for Tax Purposes Act (UDITPA) (§ 25120 et seq.), which applies to corporations with multistate activities. (§§ 25128–25136.) Under UDITPA a corporation's income is apportioned based on the proportion of the corporation's payroll, property and sales in the taxing state. (*Ibid.*)

Because the covenant had no value in California, the trial court found that imposition of the tax violated the requirement of the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3) that taxes imposed by the states be fairly apportioned. (See *Complete Auto Transit, Inc. v. Brady* (1977) 430 U.S. 274, 279 [51 L.Ed.2d 326, 97 S.Ct. 1076].)

The FTB filed a timely notice of appeal.

I

In its first argument on appeal the FTB contends that because the Milhouses did not pay the interest accrued on the taxes assessed by the FTB, the trial court had no subject matter jurisdiction over the Milhouses' complaint. Notably, the FTB did not raise this issue in the trial court.

The FTB relies upon article XIII, section 32[3] of the California Constitution and Revenue and Taxation Code section 19382,[4] which together embody California's adoption of the "pay now, litigate later" rule in tax

---

[3] Article XIII, section 32, states: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."

[4] Section 19382 states: "Except as provided in Section 19385, after payment of the tax and denial by the Franchise Tax Board of a claim for refund, any taxpayer claiming that the tax computed and assessed is void in whole or in part may bring an action, upon the grounds set forth in that claim for refund, against the Franchise Tax Board for the recovery of the whole or any part of the amount paid."

cases. Under the rule a taxpayer may not obtain judicial review of the validity of a tax which is due but has not been paid. (*State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 638 [217 Cal.Rptr. 238, 703 P.2d 1131].) This rule serves the important goal of assuring that governmental agencies have a reliable source of income with which to fund vital public services. (*Ibid.*; *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 283 [165 Cal.Rptr. 122, 611 P.2d 463]; *Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 731–732 [192 P.2d 916] (*Modern Barber*).)

Prior to January 1, 2001, the law was clear that for purposes of applying the "pay now, litigate later" rule, the required payment of an assessed tax did not include payment of any accrued interest. (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 333–334 [87 Cal.Rptr.2d 423, 981 P.2d 52]; *Chen v. Franchise Tax Bd.* (1999) 75 Cal.App.4th 1110, 1122 [90 Cal.Rptr.2d 268].) However, as of January 1, 2001, section 19101, subdivision (c), was amended to provide in pertinent part: "Any reference in Part 10 (commencing with Section 17001) . . . or this part (except Article 3 (commencing with Section 19031), relating to deficiency assessments) to any tax imposed by Part 10 (commencing with Section 17001) or Part 11 (commencing with Section 23001) *shall be deemed also to refer to interest imposed by this article on that tax.*" (Italics added.) Because both section 19101 and section 19382 are in part 10.2 of the code, the FTB argues that as of January 1, 2001, the Milhouses were required to pay both the tax assessed and the accrued interest before commencing their refund action. As we have noted, the Milhouses paid the assessed taxes after January 1, 2001.

The FTB concedes that it did not raise the interest issue in the trial court or in any other manner give the Milhouses notice that they were required to pay interest as well as taxes before commencing this action. Nonetheless, the FTB argues that any failure by the Milhouses to meet the requirements of the "pay now, litigate later" rule deprived the trial court of subject matter jurisdiction over the Milhouses' claim and that the usual rules which prevent us from considering an issue not raised in the trial court have no application. We disagree with FTB's premise. The "pay now, litigate later" rule, while important, is not a matter of subject matter jurisdiction.

■ In *State Bd. of Equalization v. Superior Court, supra,* 39 Cal.3d at page 639, the court noted that in *Modern Barber*, it had previously considered a statutory version of the "pay now, litigate later" rule. Importantly, the court in *State Bd. of Equalization v. Superior Court* found that the statutory version of the rule considered in *Modern Barber* is virtually identical to article 13, section 32 of the Constitution. (*State Bd. of Equalization v. Superior Court, supra,* 39 Cal.3d at p. 639.) Thus the discussion

of the nature of the "pay now, litigate later" rule which appears in *Modern Barber* is fairly authoritative here. In *Modern Barber* the court rejected a taxpayer's argument that the statutory "pay now, litigate later" provision was an unconstitutional limitation on the trial court's power to issue a writ of mandamus and stated: "[W]here the Legislature has not sought either to enlarge or curtail the jurisdiction to issue the writ, nor to change its nature or function, there is nothing unconstitutional in its regulation either of the procedure for invoking the writs or of the substantive rights of parties and the remedies available for their enforcement. The legislative enactment of reasonable procedural conditions precedent to invoking a particular remedy, or the substitution of one remedy (such as an action at law in the superior court) for another (such as a proceeding in mandamus), cannot be considered an interference with the jurisdiction over such remedies vested in courts by the Constitution." (*Modern Barber, supra,* 31 Cal.2d at p. 731.)

■ The court's treatment of the "pay now, litigate later" rule as merely a procedural condition precedent to the pursuit of a remedy rather than a limitation on the underlying jurisdiction of courts over tax claims defeats the FTB's contention that any failure by the Milhouses to pay interest on the assessed taxes deprived the trial court of subject matter jurisdiction. In this regard we find the following analysis persuasive: "The 'pay first, litigate later' rule bars an action to challenge a tax before the tax has been paid, as stated *ante*. A court has no authority to grant relief to a taxpayer in a prepayment action where the rule applies, so any relief granted can be said to be in excess of jurisdiction. (See *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288, 291 [109 P.2d 942] [distinguishing 'lack of jurisdiction' in a fundamental sense from 'lack of jurisdiction' or 'excess of jurisdiction' in a broader sense]; *In re Andres G.* (1998) 64 Cal.App.4th 476, 482 [75 Cal.Rptr.2d 285].) We construe statements to the effect that a court has no jurisdiction to grant relief to a taxpayer in a prepayment action (e.g., *Agnew v. State Bd. of Equalization, supra,* 21 Cal.4th 310, 323) to mean that any relief granted would be in excess of jurisdiction in the broader sense. This does not mean that a court has no fundamental jurisdiction over the subject matter in such an action or that an objection based on the 'pay first, litigate later' rule cannot be waived. '[I]ssues relating to jurisdiction in its less fundamental sense may be subject to bars including waiver . . . and forfeiture . . . .' [Citation.] 'The parties to an action over which the court has general jurisdiction cannot be heard to claim lack of power to try a particular issue after they have consented to a trial thereof and have participated in the same. [Citations.]' [Citation.] ■ Article XIII, section 32 of the state Constitution and similar statutory provisions do not state that a court has no subject matter jurisdiction to hear an action if the taxpayer challenges a tax before paying the tax, but only that a court has no authority to grant relief to a taxpayer in those circumstances. We therefore conclude that the 'pay first,

litigate later' rule, to the extent it might apply in these circumstances, does not affect a court's fundamental jurisdiction and can be waived. (Cf. *Mower, supra,* at p. 474, fn. 6 [held that limited immunity from prosecution under Health & Saf. Code, § 11362.5, subd. (d), does not affect a court's fundamental jurisdiction and can be waived]; *Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 731 [192 P.2d 916] [held that a statutory 'pay first, litigate later' rule in the former Unemployment Insurance Act did not restrict the court's original jurisdiction in a mandate action].)" (*County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1119, fn. 5 [5 Cal.Rptr.3d 575].)

Because the "pay now, litigate later" rule did not implicate the trial court's subject matter jurisdiction, the FTB's failure to raise the issue in the trial court prevents it from relying on it for the first time on appeal. (*County of Los Angeles v. Southern Cal. Edison Co, supra,* 112 Cal.App.4th at pp. 1118–1119.)[5]

## II[6]

██ A state tax imposed on a nonresident meets the requirements of the commerce clause if it is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." (*Complete Auto Transit, Inc. v. Brady, supra,* 430 U.S. at p. 279.) With respect to the question of fair apportionment, a taxpayer must demonstrate that there is no " 'rational relationship between the income attributed to the State and the intrastate values of the enterprise.' " (*Exxon Corp. v. Wisconsin Dept. of Revenue* (1980) 447 U.S. 207, 220 [65 L.Ed.2d 66, 100 S.Ct. 2109], quoting *Mobil Oil Corp. v. Commissioner of Taxes* (1980) 445 U.S. 425, 436–437 [63 L.Ed.2d 510, 100 S.Ct. 1223].) Importantly, the taxpayer has the " 'distinct burden of showing by "clear and cogent evidence" that [the state tax] results in extraterritorial values being taxed.' " (*Exxon Corp. v. Wisconsin Dept. of Revenue, supra,* 447 U.S. at p. 221.) Justice Frankfurter aptly summarized these principles in *Wisconsin v. J.C. Penney Co.* (1940) 311 U.S. 435, 444 [85 L.Ed. 267, 61 S.Ct. 246, 250]: "[The] test is whether . . . the

---

[5] Because we have determined that the "pay now, litigate later" rule did not implicate the trial court's jurisdiction, we need not and do not consider the legislative history and pleadings in unrelated cases which are the subject of the Milhouses' request for judicial notice. Accordingly, the request is denied.

[6] We note the Milhouses have filed a cross-appeal from a portion of the trial court's judgment. In their briefs they challenge that portion of the trial court's judgment which found that the covenant had a business situs in California. As our discussion indicates, in light of proof the covenant had no value in this state, we need not and do not reach this issue.

taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return."

■ The subject of this appeal is of course the Milhouses' sale of their right to do business in North America. The taxation of such an intangible right is difficult. (See *Mobil Oil Corp. v. Commissioner of Taxes, supra,* 445 U.S. at pp. 436–437.) Historically, income from intangibles has been taxed at the domicile of the owner. In doing so, taxing states, including California, have relied on the doctrine of *mobilia sequuntur personam*— movables follow their owner.[7] "In cases where the owner of intangibles confines his activity to the place of his domicile it has been found convenient to substitute a rule for a reason, [citations], by saying that his intangibles are taxed at their situs and not elsewhere, or, perhaps less artificially, by invoking the maxim mobilia sequuntur personam, [citations], which means only that it is the identity or association of intangibles with the person of their owner at his domicile which gives jurisdiction to tax." (*Curry v. McCanless* (1939) 307 U.S. 357, 367 [83 L.Ed. 1339, 59 S.Ct. 900], italics omitted; accord *Miller v. McColgan* (1941) 17 Cal.2d 432, 443.)

■ Importantly, a nondomiciliary state may also tax income from an intangible where the capital which produces the income is in the nondomiciliary state. (*Curry v. McCanless, supra,* 307 U.S. at p. 367; § 17952.) This exception to the doctrine of *mobilia sequuntur personam* arises because "when the taxpayer extends his activities with respect to his intangibles, so as to avail himself of the protection and benefit of the laws of another state, in such a way as to bring his person or property within the reach of the tax gatherer there, the reason for a single place of taxation no longer obtains." (*Curry v. McCanless, supra,* 307 U.S. at p. 367.) Thus section 17952 provides that income from intangibles held by nonresidents is taxable in California if "the property has acquired a business situs in this state." As amplified in a corresponding regulation: "Intangible personal property has a business situs in this State if it is employed as capital in this State or the possession and control of the property has been localized in connection with a business, trade or profession in this State so that its substantial use and value attach to and become an asset of the business, trade or profession in this State." (Cal. Code Regs., tit. 18, § 17952, subd. (c).)

Because at all relevant times the Milhouses were residents of Florida, California cannot rely upon on the doctrine of *mobilia sequuntur personam.* Rather, in the absence of *mobilia sequuntur personam,* California may tax

---

[7] In California the doctrine is set forth in Civil Code section 946, which provides: "If there is no law to the contrary, in the place where personal property is situated, it is deemed to follow the person of its owner, and is governed by the law of his domicile."

only that portion of the $30 million the Milhouses received which was generated by activities in this state or from capital located or associated with this state. (See *Curry v. McCanless, supra*, 307 U.S. at p. 367; § 17952.) Because there is no dispute the Milhouses did not, as individuals, conduct any business in California, there is no intrastate activity upon which taxation of the payment can be based. However, to the extent the Milhouses gave up a valuable opportunity to do business in California, capital associated with this state, albeit entirely intangible and inchoate capital, arguably generated income for the Milhouses and arguably the Milhouses thereby availed themselves of the protections and benefits of California's laws. Under this theory proof that operation of the covenant in this state had value to a buyer, along with some means of comparing that value with the remaining value of the covenant, might provide a basis for determining that part of $30 million could be fairly taxed here. However, on this record, we need not determine whether such a theory of taxation is available to nondomiciliary states. The Milhouses amply demonstrated that the covenant not to compete had no value here. They testified at the time of this sale that Treasure Chest had 100 percent of the market here and that the business is very capital intensive. Contrary to FTB's contention, their expert, Dr. Shapiro, could reasonably rely on their testimony and out-of-court statements about the business, in concluding that it would not have been reasonable for anyone to attempt to compete with TCA in California. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People ex rel. Dept. of Public Works v. Alexander* (1963) 212 Cal.App.2d 84, 95 [27 Cal.Rptr. 720].)

This leaves for our consideration the FTB's contention that, although the covenant had no value in this state, the amount of Treasure Chest's California income is nonetheless a rational means of determining what portion, if any, of the $30 million may be taxed by the FTB. We note that because TCA, not Treasure Chest, paid for the covenant in a lump sum at the close of the transaction, there is no connection between Treasure Chest's income and the source of money the Milhouses received. We also note the rights the Milhouses gave up under the covenant were never a part of Treasure Chest's assets; rather, the rights the Milhouses sold were their individual rights to compete with Treasure Chest and its successor, TCA. Because neither the income the Milhouses received nor the rights they sold bear any direct or meaningful relationship to the income or assets of Treasure Chest, Treasure Chest's income and assets simply do not provide any means of determining how much of the $30 million in income the Milhouses received can be fairly apportioned to activities or capital in this state.

In sum then, there is nothing in this record which shows that any portion of the payments the Milhouses received on the covenant arose from activities in this state or from capital which is located in or associated with this state. Thus California cannot fairly tax any portion of the payments the Milhouses received on the covenant.

Accordingly, the judgment of the trial court is affirmed. Respondents to recover their costs of appeal.

McConnell, P. J., and Huffman, J., concurred.