[No. G041370. Fourth Dist., Div. Three. Apr. 13, 2009.]

D.M. et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in
Interest.

COUNSEL

Nicole Williams for Petitioner D.M.

Rich Pfeiffer for Petitioner L.M.

Benjamin P. de Mayo, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Offices of J. Michael Hughes and Lawrence A. Aufill for Minor C.M.

OPINION

ARONSON, J.—D.M. (father) and L.M. (mother) (collectively, petitioners or parents) seek writ relief from the order of the juvenile court sustaining dependency jurisdiction over their now 15-year-old adopted daughter, C.M. (See Welf. & Inst. Code, § 300, subds. (b), (g); all further undesignated statutory references are to this code.) Parents do not wish to reunify with C.M.; rather, the gist of their position is that C.M. should be a ward of the court instead of a dependent so they can be spared the asserted stigma of dependency proceedings. Counsel for the minor opposes the writ petition. For the reasons we explain below, petitioners' challenges are without merit, and we therefore affirm the order sustaining dependency jurisdiction over C.M.

I

FACTUAL AND PROCEDURAL BACKGROUND

Consistent with the standard of review, we set out the facts in the light most favorable to the juvenile court's order. (See *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 229 [30 Cal.Rptr.3d 145, 113 P.3d 1159]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 364, p. 414 [" 'All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact.' "].)

Exposed by her birth mother to narcotics in utero, C.M. endured years of abuse and neglect at her birth mother's hands. Her birth mother struck her and reportedly prostituted her to feed a drug habit. C.M. vividly remembered being sexually abused by a maternal uncle when she was four years old. Orange County Social Services Agency (SSA) removed C.M. from her birth

mother's custody at age five. After two prospective adoptive families disintegrated in divorce, petitioners, who had adopted C.M.'s younger half siblings, accepted C.M. on a "trial basis" because she had nowhere else to go. Petitioners adopted C.M. in 2003 at age nine.

According to C.M., she never felt a sense of belonging with her adoptive parents. Her birth mother reappeared in her life when she was in seventh grade, showering her with affection. The birth mother contacted C.M. at school and attended her basketball practices. Meeting surreptitiously, C.M. enjoyed the attention. But her behavior deteriorated, marked by lying, stealing, a defiant attitude, and truancy. She stole money from her adoptive mother to give to her birth mother, and stole cell phones from friends to call her birth mother. Petitioners placed C.M. on restriction and further attempted to modify her behavior and safeguard her by moving her to a different school.

Petitioners grounded C.M. on May 17, 2008, after she received a poor report card and a classmate's father complained she harassed his daughter with hostile text messages. While the rest of the family attended a birthday party, C.M. remained home. Later claiming she only intended to cause the two family dogs to have diarrhea for her mother to clean up, C.M. fed the animals her adult sister's medication, naproxen. The family returned home to find one dog already dead and the other, foaming at the mouth, about to die. Petitioners called the police, who arrested C.M. for animal cruelty, escorting her out of the house in handcuffs. The police transported C.M. to juvenile hall, where she spent two months awaiting a delinquency hearing on two counts of misdemeanor animal cruelty filed by the district attorney.

Based on the incident, a social worker filed a child abuse report against C.M. for emotional abuse of her siblings. The worker also filed a report against mother because she reacted to the incident by angrily grabbing C.M.'s upper arms hard enough to leave bruises. The social worker counseled petitioners to have an "action plan" ready to handle C.M. if and when she was released from juvenile hall.

A psychologist, Dr. Jennifer Bosch, and a therapist, David Glavoss, evaluated C.M. in juvenile hall. Both concluded C.M. only meant to make the dogs sick and that she was extremely remorseful and fearful of being abandoned by her parents. Bosch suspected C.M. suffered from reactive attachment disorder; she cautioned C.M.'s mental health might "spiral downward" without an emotionally available parental figure. Glavoss diagnosed C.M. with posttraumatic stress disorder resulting from sexual abuse,

abuse and neglect by her birth mother, loss of her birth mother, failed adoptive placements and rejections, and unprocessed trauma. Bosch and Glavoss concurred, however, that C.M. was "very salvageable," noting a remarkable absence, in light of her history, of drug or alcohol usage, sexual acting out, school failure, or significant defiance or criminal behavior other than the charged incident. According to Bosch, psychological testing indicated C.M. would not harm another person and that "with the right interventions it is unlikely that she will act out on an animal again." Bosch explained to petitioners, however, that C.M.'s progress "would require a lot of work and commitment on their part and that they would have to be able to love her unconditionally and put this behind them," likely requiring intense therapeutic support themselves.

On June 11, 2008, the delinquency court sustained the district attorney's animal cruelty allegations against C.M. and ordered a probation report. Based on her interview with the parents, the probation officer concluded they "have no desire to reunify with the minor." According to the probation officer, the parents planned "to pursue reversal of the adoption." The officer "d[id] not recall that the parents ever referred to the child they have raised for the past seven years as their 'daughter.' It is clear they want no part of a future relationship with her." They proffered no relatives or suitable adults to assume responsibility for C.M.

Observing "the 65 days in custody have made the desired impact upon the minor, that such thoughtless and cruel behavior will not be tolerated," the probation officer recommended informal probation instead of wardship for C.M. (§ 725.) "Since her adoptive parents will not take her back home," the probation officer observed "the minor will again need protective custody," and recommended the "services and resources of Social Services." The delinquency court rejected the district attorney's request to declare C.M. a ward of the court, ordered informal probation, and released her to Orangewood Children's Home. The delinquency court recommended placing C.M. in a home without small children or animals.

SSA immediately filed a dependency petition alleging C.M. came under the juvenile court's jurisdiction under section 300, subdivision (b), for her parents' failure to protect her, including the allegation her mother left bruises on her arm, and under subdivision (g) because C.M. was left without any provision for support. The juvenile court detained C.M., noting, "I think we have no choice but to go forward . . . because . . . she has nowhere to go." The parents declined reunification services. Based on the possibility the court could declare C.M. a ward of the court *if* she failed to follow the terms of her probation, the juvenile court granted petitioners' request for a joint report from SSA and the probation department concerning whether dependency or wardship status would be more appropriate for C.M.

In October 2008, after conferring with C.M.'s former and current probation officers, C.M.'s social worker filed a report with the juvenile court reflecting their joint conclusion dependency status remained more appropriate than wardship for C.M. The report recounted 12 "decision-making criteria," of which only one supported wardship—C.M.'s presumed maturity at age 14. The juvenile court rejected the parents' challenges to the report, sustained dependency jurisdiction over C.M., and petitioners now pursue this writ petition.

## II

## DISCUSSION

### A.  *Section 241.1 Furnishes No Basis for Writ Relief*

■  Petitioners contend the report SSA and the probation department prepared for the juvenile court under section 241.1 was inadequate because the social worker allegedly prepared it unilaterally, without independent assessment by C.M.'s probation officers of certain factors enumerated in section 241.1. Section 241.1 sets forth the procedure for the juvenile court to handle cases in which it may have dual bases for jurisdiction over a child. Under section 300, a child who is neglected or abused falls within the juvenile court's protective jurisdiction as a "dependent child of the court." Alternatively, the juvenile court may take jurisdiction over a minor as a "ward of the court" when the child is habitually disobedient or truant (§ 601), or commits a crime (§ 602).

Section 241.1 requires that whenever it appears a minor may fit the criteria of both a dependent child and a delinquent ward, the child protective agency and the probation department must jointly "initially determine which status will serve the best interests of the minor and the protection of society." (§ 241.1, subd. (a).) Both agencies present their recommendations to the juvenile court, which then must determine the appropriate status for the child. (*Ibid.*) Dual jurisdiction is generally forbidden; a minor may not be both a dependent child and a delinquent ward of the court absent a written protocol agreed upon by the presiding judge of the juvenile court, the child protective agency, and the probation department. (See § 241.1, subds. (d), (e); *In re Henry S.* (2006) 140 Cal.App.4th 248, 254 [44 Cal.Rptr.3d 418].) The record does not suggest there is such an agreement in Orange County, and neither party argued for dual jurisdiction.

Petitioners' attack on the section 241.1 report fails for several reasons. First, we are not persuaded a report was required under section 241.1. The juvenile court that considered the district attorney's delinquency petition against C.M. in July 2008 declined to make her a ward of the court, instead

ordering only informal probation. (See § 725, subd. (a).) True, if C.M. performed poorly on probation, she could be returned to the juvenile court's jurisdiction as a ward of the court at her next delinquency hearing in January 2009. (*Ibid.*)

But C.M. was not a ward in November 2008 when the juvenile court assumed jurisdiction over her as a dependent child. Accordingly, there was no basis for a section 241.1 report. (*Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 320, 325 [104 Cal.Rptr.2d 425] (*LA County DCFS*) ["Where the potential for dual jurisdiction arises because a second petition is filed regarding a minor *already within the juvenile court's jurisdiction*, the court presented with the second petition shall make the necessary determination." (italics added)]; accord, *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1013 [87 Cal.Rptr.2d 84] (*Marcus G.*) ["the assessment of which status would be appropriate for the minor is to accompany the *later petition*, i.e., the petition that creates the potential for dual jurisdiction"].) Because no report was required, it follows that any error in the manner it was prepared is necessarily harmless, furnishing no basis for writ relief.

Second, even assuming arguendo a report was required, the record does not support petitioners' contention the probation department failed to participate or offer its independent assessment of the relevant criteria. "The joint assessment report must contain the joint recommendation of the probation and child welfare departments if they agree on the status that will serve the best interest of the child and the protection of society, or the separate recommendation of each department if they do not agree." (Cal. Rules of Court, rule 5.512(d); all subsequent rules references are to these rules.) "The report must also include: [¶] (1) A description of the nature of the referral; [¶] (2) The age of the child; [¶] (3) The history of any physical, sexual, or emotional abuse of the child; [¶] (4) The prior record of the child's parents for abuse of this or any other child; [¶] (5) The prior record of the child for out-of-control or delinquent behavior; [¶] (6) The parents' cooperation with the child's school; [¶] (7) The child's functioning at school; [¶] (8) The nature of the child's home environment; [¶] (9) The history of involvement of any agencies or professionals with the child and his or her family; [¶] (10) Any services or community agencies that are available to assist the child and his or her family; [¶] (11) A statement by any counsel currently representing the child; and [¶] (12) A statement by any CASA volunteer currently appointed for the child." (*Ibid.*; accord, § 241.1, subd. (b).)

Petitioners acknowledge "a report was prepared purporting to be a '241.1' report," but they assert "that report did not comply with the statute insofar as a 'joint assessment' was not prepared by SSA and the [p]robation [d]epartment. Instead, the [p]robation [d]epartment inexplicably passed the torch to

the social worker, who then proceeded to fill in the blanks of a pre-printed 241.1 report form by *herself*." (Original italics.) The report itself, however, expressly notes the social worker "conferred" with C.M.'s current and former probation officers, and both officers recommended "the child would be best served by the Dependency Court System." Because the social worker concurred with the probation department's recommendation that dependency status was more appropriate than wardship, there was no need for the two agencies to submit separate recommendations. (Rule 5.512(d).)

Additionally, the written protocol between SSA and the probation department authorized the social worker and the probation officers to prepare the section 241.1 report by conferring together by telephone rather than in person.[1] (Written protocol, p. 4.) Accordingly, the fact that one agency, SSA, memorialized the agencies' joint recommendation does not render the report invalid. To the contrary, to avoid duplicative efforts, the protocol expressly contemplates that "the party directed to provide the report"—here, SSA— "will include the joint recommendation of both parties." (*Id.* at p. 6; see also § 241.1, subd. (b) [report to be prepared pursuant to protocol developed by child welfare and probation departments].)

Petitioners complain SSA's report does not specify the probation department evaluated the above listed 12 criteria when it recommended dependency as the preferred status for C.M. (§ 241.1, subd. (b); rule 5.512(d).) We presume, however, that the department performed its duty. (Evid. Code, § 664.) The report listed the 12 criteria and specified how all but one (C.M.'s age) favored dependency rather than wardship. The juvenile court could reasonably infer from the prereport consultation between the social worker and the probation officers and from their joint preference for dependency over wardship that the report reflected SSA and the probation department's joint conclusion concerning each of the 12 criteria. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010 [70 Cal.Rptr.2d 603] [reviewing court indulges all reasonable inferences to uphold juvenile court's order].)

In any event, petitioners' attack is misguided. Petitioners seem to believe, in a circular manner, that if only the probation officers had viewed the 12 criteria the way petitioners view them, the officers would have recommended wardship for C.M. Even assuming that were true, however, petitioners overlook that the conclusions reached by SSA and the probation department, respectively, are only recommendations. (§ 241.1, subd. (a).) At the hearing on the report (see rule 5.512(g)), petitioners had the opportunity to attempt to

---

[1] We take judicial notice of the written protocol submitted by SSA.

persuade the juvenile court to view the 12 criteria the way they viewed them, i.e., favoring wardship, but they failed to persuade the court. It follows that petitioners' hypothetical assertion that the probation officers might have reached a different conclusion if they had approached the report differently is a moot point because the juvenile court's conclusion controls. (§ 241.1, subd. (a).) Petitioners' reliance on *Marcus G.* is misplaced because nothing in the record there suggested the juvenile court, or the child welfare or probation departments, considered the relevant criteria. (See *Marcus G., supra,* 73 Cal.App.4th at p. 1014 ["we have no information on whether the procedures of section 241.1 were followed"].) Here, in contrast, the juvenile court evaluated the section 241.1 report recommending dependency and rejected petitioners' contrary claim wardship was more appropriate. For all of the foregoing reasons, there is no merit to the petition for a writ concerning the probation department's participation in preparing the report.

B.  *The Trial Court Did Not Err Under Section 601*

Petitioners next argue the juvenile court erred when, in ordering the section 241.1 report, the court declined to require the probation officer to consider filing a *new* wardship petition against C.M. under section 601. Section 601, subdivision (a), provides in relevant part that "[a]ny person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian . . . is within the jurisdiction of the juvenile court which may adjudge the minor to be a ward of the court." Probation officers are authorized to initiate section 601 petitions. (§ 650.) Presumably, petitioners saw section 601 as relevant to criterion (5) of the joint assessment report under section 241.1: "The prior record of the child for out-of-control or delinquent behavior." (Rule 5.512(d); see § 241.1, subd. (b).)

Petitioners asserted C.M.'s earlier disobedience in their home, apart from that involving the family dogs, warranted a new wardship petition. Specifically, petitioners contended jurisdiction under section 601 would be appropriate, *if* the probation officer filed a petition, " 'since [C.M.] ha[d] proven herself to be beyond her parents' control and purportedly ha[d] repeatedly refused to obey her parents' reasonable orders, such as doing her chores.' " But, explaining section "601 is not part of our game plan at the time, we are [under section] 300 or 602," the juvenile court rejected petitioners' request to compel the probation department to consider a petition under section 601 as part of its section 241.1 evaluation. The juvenile court also remarked, "These cases are not filed in a [section] 601 status in any jurisdiction that I am aware of . . . ."

■ Seizing on the juvenile court's final comment, petitioners seek to utilize this writ proceeding as an avenue to attack a purported policy of the Orange County Probation Department to decline filing section 601 petitions. There are several problems with this approach. First, petitioners point to no evidence supporting their claim; the juvenile court's comment is not evidence. (Evid. Code, § 140.) Second, as noted, we are not persuaded a report under section 241.1 was required; consequently, the trial court did not err in refusing to order the probation department to consider filing a section 601 petition as part of preparing such a report. Third, the purpose of section 241.1 is to resolve a scenario where dual jurisdiction may arise from petitions that already have been filed (see *Marcus G., supra,* 73 Cal.App.4th 1008; *LA County DCFS, supra,* 87 Cal.App.4th 320), *not* to create a dual jurisdiction issue by inviting subsequent petitions. It rests in the discretion of executive branch employees—social workers, probation officers, and the district attorney—whether to file such petitions, not the juvenile court. (§§ 290.1, 650.)

Fourth, even assuming, as petitioners claim, that no separation of powers violation would have resulted had the juvenile court merely directed the probation department to *consider* its discretion under section 601, any conceivable error in refusing to do so was harmless. Simply put, given the delinquency court's lawful exercise of discretion in declining to make C.M. a ward of the court for her acts of animal cruelty, the dependency court could reasonably conclude it was unlikely the probation department would file, and equally unlikely the delinquency court would sustain, a petition based on C.M.'s failure to do her chores or similar acts much less grievous than the incident with the family dogs. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Petitioners' contentions under section 601 are therefore without merit.

C. *Substantial Evidence Supports the Juvenile Court's Jurisdictional Finding*

■ Finally, petitioners challenge the sufficiency of the evidence to support the juvenile court's order sustaining dependency jurisdiction over C.M. SSA's petition alleged jurisdiction under section 300, subdivisions (b) and (g). We address only the latter, since the juvenile court's jurisdiction may rest on a single ground. (§ 300 ["Any child who comes within *any* of the following descriptions is within the jurisdiction of the juvenile court . . . ." (italics added)]; see *In re Janet T.* (2001) 93 Cal.App.4th 377, 389 [113 Cal.Rptr.2d 163]; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [79 Cal.Rptr.2d 922]; see generally *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 [7 Cal.Rptr.2d 277] ["reviewing court may affirm [dependency jurisdiction] if the evidence supports the decision on any one of several grounds"].)

The substantial evidence standard is a difficult hurdle for an appellant or writ petitioner. "If there is any substantial evidence, contradicted or uncontradicted, which will support the judgment, we must affirm." (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113 [240 Cal.Rptr. 445].) A reviewing court is in no position to judge the credibility of witnesses or reweigh the evidence, and therefore must resolve all evidentiary conflicts in favor of the juvenile court's findings. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688]; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177 [108 Cal.Rptr.2d 493].) We conclude substantial evidence supports the juvenile court's jurisdictional finding.

Section 300, subdivision (g), provides for juvenile court jurisdiction where, as relevant here, "[t]he child has been left without any provision for support . . . *or* a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful." (Italics added.)

Petitioners contend that to protect parents from being "punish[ed]" with the stigma of a sustained jurisdictional finding, a scienter element must be implied into section 300, subdivision (g)'s provision that the "custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child . . . ." Petitioners discern support for their position in section 361.5, subdivision (b)(9), which authorizes the juvenile court to deny reunification services where "the child has been found to be a child described in subdivision (g) of [s]ection 300, that the parent . . . of the child *willfully abandoned the child*, and the court finds that the abandonment itself constituted a serious danger to the child . . . ." (Italics added.) That section further specifies " 'willful abandonment' shall not be construed as *actions taken in good faith by the parent without the intent of placing the child in serious danger.*" (Italics added.) Petitioners insist they did not "willfully abandon[]" C.M. in bad faith (*ibid.*), but instead prudently excluded her from their home to protect their other children. Petitioners decry the disgrace they perceive in section 300 proceedings: "To brand these parents 'abusers' runs afoul of the Legislative intent that the [section] 300 system is not supposed to punish the parents."

■ Petitioners' attempt to insert a willfulness or bad faith requirement into section 300, subdivision (g)'s "unwilling or unable to provide care or support" language is ill conceived. The "unwilling or unable" basis for jurisdiction does not apply to petitioners because, by its terms, it requires that the "whereabouts of the parent [be] unknown." (§ 300, subd. (g).) Instead the alternate basis for jurisdiction applies, i.e., "[t]he child has been left without any provision for support . . . ." (§ 300, subd. (g).) Petitioners' attempt to

import into subdivision (g) as a whole the "willful" abandonment standard and "good faith" exception from section 361.5, subdivision (b)(9), also fails. The Legislature's omission of similar language from section 300, subdivision (g), signals the Legislature's intent those concepts do not apply. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713] ["the words of the statute themselves . . . '. . . generally provide the most reliable indicator of legislative intent' "].)

■ Additionally, petitioners' focus on how they believe the dependency proceedings reflect poorly on them misconstrues the purpose of juvenile court dependency jurisdiction. "The purpose of the California dependency system is to protect children from harm and preserve families when safe for the child. (§ 300.2.)" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 [33 Cal.Rptr.3d 337].) Notably, the umbrella of dependency protections "ensuring the confidentiality of proceedings and records" serves not only to "protect the privacy rights of the child," but also shields the parents. (§ 300.2.) Fundamentally, however, the focus of the system is on the child, not the parents. "[T]he purpose of the provisions of this chapter relating to dependent children is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (*Ibid.*)

■ Because substantial evidence supports the juvenile court's conclusion C.M. "ha[d] been left without any provision for support" (§ 300, subd. (g)), petitioners' attempt to divert the focus of the proceedings to their interests is without merit. Nearly seven months after the social worker advised them to form a plan to handle C.M.'s release from juvenile hall, and nearly five months after she had been released, petitioners still had not secured alternative placement for their daughter by the time of the jurisdiction hearing. It appears they made no effort to do so. We reject petitioners' claim they had a Hobson's choice of barring C.M. from their home or endangering their younger children by welcoming her unconditionally. They overlook that their refusal to consider working towards reunification, with the supports Dr. Bosch listed, excluded C.M. from intermediate alternatives such as the multitreatment foster care program that placed more difficult children in specialized foster homes. In any event, regardless of petitioners' reasons, SSA correctly observes "their actions left [C.M.] with no home and nowhere to go," thus falling squarely within section 300, subdivision (g). Ample evidence therefore supports the juvenile court's conclusion C.M. required the court's protection as a dependent child.

## III

## DISPOSITION

The order of the juvenile court sustaining dependency jurisdiction over C.M. is affirmed.

O'Leary, Acting P. J., and Ikola, J., concurred.

Petitioners' petition for review by the Supreme Court was denied July 22, 2009, S173300. George, C. J., did not participate therein.