Filed 2/26/13  P. v. Williams CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B238987 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA115703) |
| v. | |
| KENNETH JOHN WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kelvin D. Filer, Judge.  Affirmed with modifications.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Kenneth John Williams appeals from the judgment entered upon his conviction by jury of first degree murder in violation of Penal Code section 187, subdivision (a).[1] The jury also found true the allegations that appellant personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), and that he committed the murder for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced appellant to 50 years to life in state prison, calculated as 25 years to life for the murder, plus a consecutive term of 25 years to life for the firearm enhancement. Appellant was ordered to make restitution in the amount of $7,954.50, plus 10 percent interest from the date of sentencing, comprised of $7,500 to the Victim Compensation and Government Claims Board (VCGCB), and $454.50 to the victim's sister Shaundra Nichols.[2] The trial court also assessed a restitution fine in the amount of $240 (§ 1202.4, subd. (b)) and imposed and stayed an equal parole revocation fine (§ 1202.45).

Appellant contends (1) there was insufficient evidence to support the gang allegation, (2) imposition of the restitution and parole revocation fines in the amount of $240 constituted an ex post facto application of the law, and (3) the trial court's restitution order to Ms. Nichols was not supported by substantial evidence.

We modify the judgment to reflect restitution and parole revocation fines in the amount of $200, and to reflect the trial court's restitution order to be $7,953.50. Appellant is to make restitution to the VCGCB in the amount of $7,500, and to Ms. Nichols in the amount of $453.50, plus 10 percent interest per year from the date of sentencing. We otherwise affirm.

---

[1] All statutory references shall be to the Penal Code unless otherwise noted.

[2] The funeral expenses totaled $7,953.50 and not $7,954.50. The court miscalculated by one dollar the amount of out-of-pocket expenses to be paid directly to Ms. Nichols.

## FACTUAL BACKGROUND

On July 1, 2010, Monique Burton (Burton) lived with appellant and his mother on Shauer Street, in the City of Compton. At approximately 1:30 p.m., appellant arrived home and was "really upset." He looked like he had been in a fight. Appellant's clothes were "tugged" and his shirt was stretched out of shape. He was not wearing his usual gold necklace. Appellant went into his bedroom and returned carrying a handgun. He put on a pair of sunglasses and drove away in a black Jaguar convertible. Vince Cooper (Cooper) sat in the car's passenger seat.

Burton went to the liquor store a few minutes after appellant drove away. She stopped at the intersection of 130th Street and Aranbe and looked for oncoming traffic. To her left she saw Dwayne Nichols (Nichols), who appeared to be bent over or kneeling in the driveway of Cooper's house. Appellant got out of a black Jaguar and walked towards Nichols pointing the gun at him. Burton heard a single gunshot as she turned the corner and drove away.

Sergeant Howard Cooper, a homicide investigator with the Los Angeles County Sheriff's Department, arrived at the crime scene at approximately 5:00 p.m. Nichols, who died from a single gunshot wound to the head, was lying in the driveway. A portion of a gold necklace lay across his chest. A single shell casing was found in the street, and a pair of black plastic sunglasses was on the sidewalk. A small piece of a broken gold necklace similar to the one discovered on Nichols's body was also found on the sidewalk.

Leticia Salas (Salas) was married to Nichols. Salas also knew appellant very well. Appellant had lived in the same house as Salas for seven years and she had been "around him every day" for the two months prior to the shooting. Salas grew up in the neighborhood and was familiar with the Corner Pocket Crips street gang (CPC). She knew that Nichols, appellant, and Cooper, were all members of that particular gang. A few days before the shooting, Nichols and appellant got into a heated argument about money and gang business. When Salas retrieved Nichols's personal property from the coroner's office, it contained a pair of sunglasses and a gold necklace. She immediately recognized the sunglasses and necklace as belonging to appellant.

3

Sergeant Cooper interviewed appellant on August 6, 2010. Appellant had suffered an injury to the right side of his neck, which was healing. Sergeant Cooper obtained a DNA sample from appellant. Juli Watkins, a senior criminalist with the Los Angeles County Sheriff's crime laboratory, testified that an analysis of fingernail clippings taken from Nichols showed the presence of appellant's DNA.

Los Angeles County Sheriff's Detective John Ganarial testified as the prosecution's gang expert. He was assigned to the operation safe streets gang unit (OSS) to gather intelligence and investigate gang activity. Detective Ganarial developed his expertise in criminal street gangs over his lengthy law enforcement career by speaking with gang members on a daily basis in the gang module at Men's Central Jail where he worked for four years. As a patrol deputy for seven years, he investigated gang crimes and arrested numerous members of the CPC. Over the past four years he had become familiar with the CPC members and was knowledgeable of their activities in his role as a detective with the OSS.

Detective Ganarial opined that there were approximately 150 members of the CPC, ranging from older members called original gangsters (OG's), who had done their time and were not expected to commit serious crimes, to workers who were actively committing crimes to gain respect for the gang, and youngsters who committed minor crimes. CPC's primary activities included murder, robbery, shootings, assaults with firearms, carjacking, and sales of narcotics. In support of this statement, Detective Ganarial described two recent cases in which he was the investigating officer. In one, a gang member was convicted of possession of a firearm by a felon, and in the other, a different gang member was convicted of robbery.

Appellant was a self-admitted member of the CPC with the moniker "K.J." Information obtained from field identification cards also identified appellant as a CPC member, who associated with other known CPC gang members, including Cooper. Nichols was also a member of the CPC and was considered an OG.

Detective Ganarial testified to the habits and culture of gangs and the central role in gang culture of respect and reputation. He explained that gang members want to be

4

feared by the ordinary citizens who live in the neighborhood because fear equals respect. But gang members also want respect from rival gang members and from people within their own gang. Disrespect requires retaliation regardless of the source, and failure to retaliate could result in being disciplined by your own gang. A gang member's reputation would be hurt and he would be labeled a "punk" if he failed to retaliate when disrespected by an older member of his own gang.

Responding to a hypothetical based on the facts of this case, Detective Ganarial opined that the shooting and killing of Nichols was committed for the benefit of, in association with, and directed by a criminal street gang. Appellant enhanced his own reputation because he showed others he was not a "punk" by retaliating against someone who had disrespected him. But Detective Ganarial's opinion was based on the fact that Nichols's shooting enhanced the reputation of the CPC among rival gang members. It sent a message to rival gangs that the CPC did not tolerate disrespect even from their own OG members, and retaliated in a deadly fashion when it occurred.

## DISCUSSION

### I.      Sufficiency of the Evidence in Support of the Gang Allegation

#### A.      *Contention*

Appellant contends that there is insufficient evidence to support the jury's true finding on the section 186.22 gang enhancement allegation. Appellant does not contest that the CPC is a criminal street gang or that he, Nichols, and Cooper are members of the gang. He argues that there was insufficient evidence that the crime was committed in association with the gang and that he had the specific intent to promote, further, or assist the criminal conduct of any gang member. He argues that the only evidence on this issue was testimony by the expert witness and there was no substantive factual evidentiary basis to the gang expert's testimony. This contention is without merit.

#### B.      *Standard of Review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

5

credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)

### C.     Relevant Authority

The gang enhancement in section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) The crime must be "'gang related.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Castaneda* (2000) 23 Cal.4th 743, 745 [gang enhancement statute "increases the punishment for some gang-related crimes"]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 56 [gang enhancement statute "applies when a crime is gang related"].) A defendant's mere membership in the gang does not suffice to establish the gang enhancement. (*People v. Gardeley, supra*, at pp. 623–624.) Rather, "'[t]he crime itself must have some connection with the activities of a gang.'" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) "[T]o prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.)

6

A gang expert properly may testify about gang affiliation and activity where such evidence is relevant to an issue of motive or intent. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518; *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*).) A gang expert properly may testify about "whether and how a crime was committed to benefit or promote a gang." (*Killebrew, supra*, at p. 657.) Similarly, a gang expert may testify about whether a defendant acted for the benefit of a gang, even though the question is an ultimate factual issue in the case, if such matters are beyond the jury's common experience. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506–509; *Killebrew, supra*, at p. 651, citing Evid. Code, § 805 ["Otherwise admissible expert opinion testimony which embraces the ultimate issue to be decided by the trier of fact is admissible"].) "'Expert opinion that particular criminal conduct benefited a gang' . . . can be sufficient to support the . . . gang enhancement. (*People v. Albillar, supra*, 51 Cal.4th at p. 63.)" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

### D. Analysis

#### 1. First Element: For the Benefit of Any Criminal Street Gang

The first element of the gang enhancement is satisfied by showing the crime was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).)

There was substantial evidence in this case from which the jury could infer that Nichols disrespected appellant, and appellant retaliated to enhance both his and the gang's reputation. Two days prior to the shooting, Salas witnessed a heated argument between Nichols and appellant over money and gang business. There was evidence that appellant had been involved in a physical altercation with somebody immediately prior to the shooting. Burton, who had known appellant all his life, testified that he appeared "upset," his clothing was disheveled, and he was not wearing his usual necklace. Appellant's neck was scratched and his DNA was found under Nichols's fingernails. Appellant's broken necklace and sunglasses were found at the scene of the crime.

Contrary to appellant's contention, Detective Ganarial's testimony did not stand alone but provided context for the actions of appellant. He testified that these particular violent crimes enhanced the reputation of not only the gang member who did the

7

shooting, but the gang as a whole. Violent crimes instill fear and intimidation into the community as a whole. Burton was told by several people not to testify against appellant and she was fearful of being shot in the head for doing so. Furthermore, as Detective Ganarial explained, the shooting of an OG by a member of his own gang also instilled fear in rival gangs and showed that the CPC would not tolerate disrespect from anyone.

We find no merit to appellant's contention that Detective Ganarial's expert opinion was "pure speculation" and not based on facts. Detective Ganarial is a well-seasoned gang expert with 15 years experience as a police officer, the majority spent in Compton where the CPC was active. He had been assigned to the gang unit for the previous four years where he had extensive contact with the CPC gang members and became knowledgeable of their activities. The prosecutor's hypothetical question was rooted in the facts shown by the evidence and was not based on "'assumptions of fact without evidentiary support.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1008.) "A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) Detective Ganarial, an expert on gang culture in general and the CPC in particular, was qualified to explain how criminal conduct could enhance the gang's reputation or benefit the gang. (*People v. Ward* (2005) 36 Cal.4th 186, 209–210.)

The jury could reasonably infer from all of the evidence that appellant shot and killed Nichols in order to increase the gang's notoriety in its territory, thereby benefitting the CPC.

### 2. Second Element: Specific Intent

With respect to the requirement that appellant committed the felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members," (§ 186.22, subd. (b)(1)), appellant need only have had the specific intent to promote, further, or assist in any criminal conduct by gang members, including the current offense, and not necessarily other criminal conduct by gang members. (See *Albillar, supra,* 51 Cal.4th at pp. 64–65.) "[T]he scienter requirement in section 186.22(b)(1)—i.e., 'the

8

specific intent to promote, further, or assist in any criminal conduct by gang members'—is unambiguous and applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Id.* at p. 66.) Although appellant acted alone, there was sufficient evidence to demonstrate that he was a member of the gang, and that his conduct in shooting Nichols was gang-related, as explained above. When appellant is a gang participant, and, acting alone, commits a gang-related felony, appellant has promoted, furthered, or assisted in felonious conduct by a gang member—i.e., himself.[3]

A reasonable juror could conclude based on the evidence presented at trial that when appellant shot and killed Nichols it was gang-related conduct, which was committed to retaliate against Nichols for disrespecting appellant, enhance the gang's reputation for violence, and help appellant maintain the respect he required as a member of the gang. Therefore, we conclude that substantial evidence supports the finding that appellant committed the felony with the specific intent to promote criminal conduct by gang members.

## II. The Restitution and Parole Revocation Fines Should be Reduced to $200

At sentencing, the trial court stated that it intended to impose a $200 restitution fine pursuant to section 1202.4, subdivision (b)(1), a fine the court stated it understood to be "the minimum." The court then stated that the fine would be $240. The trial court also imposed a parole revocation fine in the same amount, pursuant to section 1202.45.

Appellant contends that the $240 fines should both be reduced to $200, the minimum fine that could be imposed pursuant to sections 1202.4, subdivision (b)(1) and 1202.45 when the crimes were committed, because to do otherwise violates ex post facto principles. The People agree.

---

[3] The question whether a gang enhancement may be found true where a gang member acts alone in committing the underlying felony is currently under review by the Supreme Court. (See *People v. Gonzales* (2011) 199 Cal.App.4th 219, review granted Dec. 14, 2011, S197036.)

We agree with the People. Although sentencing took place on January 27, 2012, and the minimum fines were increased to $240 as of January 1, 2012 (Stats. 2011, ch. 358, § 1), the minimum fines at the time appellant committed his offense were $200 (Stats. 1996, ch. 629, § 3). Because the trial court intended to impose the minimum fines, and the minimum fines at the time appellant committed the offense were $200, the fines should both be reduced to $200. (*People v. Downing* (1985) 174 Cal.App.3d 667, 672.)

## III. The Trial Court's Restitution Order is Modified

The People's sentencing memorandum contained documentation from the VCGCB, which showed that the funeral expenses totaled $7,953.50, of which $7,500 was paid by VCGCB.

At the sentencing hearing, the trial court ordered appellant "to pay direct restitution to the victim, pursuant to Penal Code section 1202.4 (f) in the amount of $454.50 plus interest directly to Ms. Nichols, in the amount of $7,500 plus 10 percent interest, payable to victim restitution fund for the funeral expenses that were paid for the victim in this case."[4] The trial court then imposed mandatory fines and fees and informed appellant of his right to appeal. After a discussion to clarify the amount to be paid to the VCGCB, the court asked the parties if there was "anything else?" Defense counsel made no objection to the restitution order and failed to request a restitution hearing.

Appellant contends that there was insufficient evidence that Ms. Nichols incurred any out-of-pocket expenses and the trial court erred by ordering restitution in the amount of $454.50.[5] The People contend that appellant forfeited the restitution issue by failing to object at the sentencing hearing. We agree with the People.

---

[4] The provision of the court's restitution order which included 10 percent interest accruing from the date of sentencing was not addressed by appellant, and it stands.

[5] As previously noted, the funeral expenses totaled $7,953.50 and the amount of out-of-pocket expenses at issue is $453.50 and not $454.50.

10

Section 1202.4, subdivision (f) provides that "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." A claim that a restitution order is unwarranted by the evidence, as opposed to being unauthorized by statute, is forfeited if neither raised in the trial court by objection nor by a request for a hearing to determine the amount. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*).) Here, appellant made no objection when the trial court announced the amount of the victim restitution it was ordering, nor did he request a hearing to contest that amount. Consequently, his claim that the restitution order was unsupported by the evidence has been forfeited.

Appellant's reliance on *In re K.F.* (2009) 173 Cal.App.4th 655 is misplaced. There, during a restitution hearing arising from a juvenile delinquency proceeding, the trial court denied a request by the juvenile's counsel for a continuance to permit him to obtain records related to the victim's medical expenses; it then declined to stay the proceedings pending an appeal by the juvenile, and issued a restitution order. (*Id.* at pp. 658–659.) The appellate court held that notwithstanding *Brasure,* the juvenile had not forfeited his challenges to the sufficiency of the evidence supporting the amount of restitution ordered. (*In re K.F., supra,* at pp. 660–661.) Here, unlike *In re K.F.,* appellant neither objected to the amount of restitution nor requested an evidentiary hearing. Under the circumstances, the holding in *Brasure* is binding on us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In sum, appellant has forfeited his contention of error regarding the restitution order.

The restitution order is modified only to correct the mathematical error in the trial court's calculation. The amount of direct restitution appellant is ordered to pay to Ms. Nichols is $453.50 and not $454.50, i.e., the difference between the amount billed and the amount paid by the VCGCB.

11

## DISPOSITION

The judgment is modified to reflect a restitution fine pursuant to section 1202.4, subdivision (b), in the amount of $200 and a restitution fine pursuant to section 1202.45 in the amount of $200, the latter to be suspended unless appellant's parole is revoked. The judgment is also modified to reflect the trial court's restitution order pursuant to section 1202.4, subdivision (f) in the amount of $7,953.50. Appellant is to make restitution to the VCGCB in the amount of $7,500, and to Ms. Nichols in the amount of $453.50, plus 10 percent interest per year from the date of sentencing. The superior court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation.

As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
BOREN

_____, J. *
FERNS

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.