Filed 10/9/20  P. v. Layton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TRAVIS LEE LAYTON,<br><br>      Defendant and Appellant. | C084305<br><br>(Super. Ct. No. 62129149A) |

SUMMARY OF THE APPEAL

A jury found that defendant Travis Lee Layton conspired with two codefendants, Charles Maravilla and Alfredo Martinez, and then carried out the robbery of Michael Chavez.  The jury also found true various enhancements to the crimes, including that

1

defendant carried a firearm pursuant to Penal Code section 12022.53[1], subdivision (b) when he committed the robbery, and that he carried a firearm during a street gang crime pursuant to section 12021.5 while engaged in carrying out the conspiracy. The jury hung on a count that alleged defendant participated in a criminal street gang, but defendant later entered a plea of no contest to that count. On appeal, defendant argues that (1) because after judgment was entered in this case the Legislature amended section 12022.53 to allow trial courts to exercise discretion in imposing a sentencing enhancement pursuant to that section, we must remand this case to the trial court so that it may exercise its discretion as to whether to impose an enhancement; (2) the trial court improperly imposed a concurrent sentence for the gang crime, when it should have instead stayed the sentence pursuant to section 654; and (3) the true finding on the enhancement under section 12021.5 must be reversed for insufficient evidence, because the jury hung on the gang crime and all other criminal street gang enhancements alleged against defendant. The People do not dispute any of defendant's arguments. We, however, disagree with the third argument. As such, we will remand the case for resentencing, but affirm the jury's finding of truth with respect to the section 12021.5 enhancement.

## FACTS AND LEGAL PROCEEDINGS

### *The Robbery*

On March 8, 2014, Chavez contacted Sammy Choi through Facebook Messenger seeking to procure narcotic pain relievers (norcos). Choi then put Chavez in touch with Maravilla. Maravilla and Chavez corresponded by Facebook Messenger and telephone about Maravilla supplying Chavez with Norcos. In an interview with the police, Chavez said that on the morning of March 13, 2014, he reached out to Maravilla, and Maravilla

---

[1] Unless otherwise indicated, all citations to sections are to the Penal Code.

2

told Chavez he did not have any norcos, but that he should call "Tyler." Maravilla gave Chavez a number to reach "Tyler." The person Chavez spoke with at the number Maravilla provided suggested he had unlimited access to norcos and that Chavez should contact him when he was ready to purchase them. When Chavez spoke with the contact later in the day, Chavez indicated he was not yet ready to buy norcos. The contact asked if Chavez might have weed to sell. Chavez said he could get some weed.

Chavez then obtained some weed and told Melody Miller—a woman he had been spending some time with that afternoon—he would pay for her gas if she would give him a ride to meet with someone to sell some weed. Chavez drove Miller's car to a park where he had arranged to meet the person he spoke to on the phone. Chavez, Miller, and another car passenger waited for approximately 20 to 30 minutes when Chavez called his contact to see what was going on. The person Chavez spoke with asked Chavez to drive up the street to meet him. When Chavez and his companions arrived at the new location, Chavez saw a man wearing a red pullover hoodie with words like "Northern Cali" on it. Chavez observed in an interview with the police that "[e]verything on him was red" and he was wearing a hoodie even though it was hot outside. Chavez got out of the car, and the person asked him to come back to his house with him. Chavez declined then reached into the car to pick the marijuana up off the driver's side seat. The man then pulled out a gun. Chavez threw the marijuana at him then ran away, returning later, and meeting with police officers who arrived on scene. During a later interview with police, Chavez identified defendant as the person who robbed him from a photo lineup.

*The Conspiracy*

At approximately midnight on March 10, 2014—two days after Chavez first communicated with Maravilla about buying norcos and three days before the robbery— Maravilla sent a Facebook message to Martinez and said, "I need money." The two then messaged back and forth about possibly doing "something." Martinez indicated that he

3

was trying to save up some money to go to Chico and suggested, "will plan something [tomorrow] to get money."

Roughly 24 hours later, Martinez engaged in a conversation via Facebook messenger with a 14-year-old boy, Sam T., the substance of which was subsequently deleted. Around the same time as Maravilla's conversation with Sam T., Martinez started writing to Maravilla "using code." For example, in one message Martinez wrote to Maravilla indicating an "air soft desert eagle is fucking sick!!" Sam T. testified he wound up taking his father's gun and lending it to Martinez, because he believed Martinez was having "gang troubles" with "the Southerners," and Sam T. wanted to help Martinez out. Sam T. placed the gun in a backpack before he gave it to Martinez.

The evening of March 11, 2014, Maravilla and Martinez had a discussion on Facebook Messenger about hanging out with "Travis." Maravilla suggested that he and "Austin," with whom he was already hanging out, meet up with Martinez and then they could "mob" Travis. Martinez then asked if Maravilla and Austin could "swoop me and [G]abe," which Maravilla indicated might be a problem because "they low on gas." The next afternoon, March 12, 2014, Martinez asked Maravilla if they were "still bouta [*sic*] go to [C]hico[?]" Maravilla responded, "[hell] yea," indicating they would "prob Thursday." Maravilla stated, "some fools really actin[g] hard though," to which Martinez responded, "foreal dam im [*sic*] down oh yeah they gonna [*sic*] turn soft when I pull this shit out." Sydney Smith, who used to date Austin Benjamin, testified at trial that on the day of the robbery, she was at defendant's home along with Benjamin, Maravilla, and Martinez. At trial, an expert stated that Benjamin was a definite associate of the West Roseville Norteños.

Defendant later indicated to police officers that on the day of the robbery, someone brought a gun in a backpack to his house and that the plan was for the gun to be used in a robbery to obtain marijuana. Martinez also "cracked" at one point when interviewed by the police and told them he brought the gun to defendant. After the

4

robbery, Benjamin reached out to Maravilla, asking him to call and not text. Eventually, Benjamin simply wrote Maravilla a note saying "[t]ell Travis you saw Nick with it." A Roseville police officer later recovered a gun from Nick Jones. Sam T. later identified the gun recovered from Jones as his father's gun, which he had given to Martinez.

Additional facts are incorporated into the discussion below where appropriate.

*Jury Trial and Sentencing*

At trial, the People argued that Maravilla set up a supposed drug deal with Chavez, Martinez procured the firearm, and then the codefendants met up at defendant's home, where Martinez gave defendant the gun. Defendant then went to the prearranged location to carry out the "quote, unquote, drug deal" which was really a robbery.

The jury found defendant guilty on two of the five counts the People alleged against him: count two for felony second degree robbery pursuant to section 211, and count five for conspiracy to commit a crime under section 182, subdivision (a)(1). The jury also found true various enhancements to the robbery and conspiracy counts, including an enhancement to the robbery count, for personally carrying a firearm pursuant to section 12022.53, subdivision (b), and an enhancement to the conspiracy count for carrying a firearm during the commission of a street gang crime pursuant to section 12021.5. The jury hung on count four, which alleged defendant committed street terrorism pursuant to section 186.22, subdivision (a)—i.e. that he actively participated in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity—and on enhancement allegations to counts two and five that he committed the robbery and conspiracy crimes "for the benefit of, at the direction of, or in association with a criminal street gang" pursuant to section 186.22, subdivision (b). However, at the sentencing hearing, defendant entered a plea of no contest to count four.

5

The trial court issued an unstayed sentence of 13 years in prison on count two, which included a 10-year sentencing enhancement for the section 12022.53, subdivision (b) finding.  It imposed a two-year concurrent sentence on count four.  It imposed a total sentence of six years for count five, but stayed it pursuant to section 654.  Two years of the stayed sentence on count five were for the section 12021.5 enhancement.

Defendant timely filed this appeal.

## DISCUSSION

### I

### *The Trial Court Must Be Given the Opportunity to Exercise Its Discretion under the Amended Version of Section 12022.53*

Defendant argues that this court must remand this case to allow the trial court to use its discretion to strike or not strike the 10-year section 12022.53 sentencing enhancement imposed for the robbery offense.  The People agree.  We also agree.

According to section 12022.53, subdivision (b), "[n]otwithstanding any other provision of law, any person who, in the commission of a felony [robbery] personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years."  At the time the trial court sentenced defendant, section 12022.53, subdivision (h), prohibited a court from striking an allegation or a finding that a person used a firearm in committing a felony robbery.  (See § 12022.53, subd. (h) (2017).)

After the trial court sentenced defendant, the Legislature amended section 12022.53, subdivision (h), to allow a trial court, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement" that section 12022.53 required.  (§ 12022.53, subd. (h); see also Stats. 2017, ch. 682, § 2.)  The authority to strike or dismiss a finding that a person used a firearm in the commission

6

of an offense extends to "any resentencing that may occur pursuant to any other law." (*Ibid.*)

As articulated by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740, 742, when a statute is amended that mitigates a punishment after the prohibited act is committed but before final judgment, the "punishment provided by the amendatory act should be imposed." In *People v. Francis* (1969) 71 Cal.2d 66, 76, our Supreme Court applied *Estrada* to circumstances in which "the amendment does not revoke one penalty and provide for a lesser one but rather vests in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." In *Francis*, our Supreme Court also clarified that the amended penalty statute would apply in instances in which the amendment occurred after sentencing in the trial court but before the case was resolved on appeal. (*Id.* at p. 77.)

Here, the amendment to subdivision (h) of section 12022.53 "necessarily reflects a legislative determination that the previous bar on striking firearm enhancements was too severe, and that trial courts should instead have the power to strike those enhancements in the interest of justice." (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.) Additionally, "because there is nothing in the amendment to suggest any legislative intent that the amendment would apply prospectively only, we must presume that the Legislature intended the amendment to apply to every case to which it constitutionally could apply, which includes this case." (*Ibid.*) Accordingly, remand is appropriate in this case to allow the trial court to exercise its discretion as to whether to strike the firearm enhancement.

7

## II

*The Court Improperly Imposed Concurrent Sentencing on Count Four*

Defendant argues, and the People agree, that the trial court should have stayed sentencing on count four rather than imposing a concurrent sentence for that count. We agree.

Section 654 provides "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Accordingly, "[w]hen a defendant suffers multiple convictions, sentencing for some of which is precluded by operation of section 654, an acceptable procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable. Such stay is to be effective pending the successful service of sentence for the more serious conviction, at which time the stay is to become permanent." (*People v. Miller* (1977) 18 Cal.3d 873, 886.) In contrast, concurrent sentences, "do not cure an error of multiple punishment prohibited by Penal Code section 654." (*People v. Spangler* (1980) 113 Cal.App.3d 1039, 1046, fn. 2.)

Here, because defendant's active participation in the criminal street gang was conspiring to commit and committing the robbery, and the total sentence on the robbery count was 13 years while the total sentence on the criminal street gang count was two years, the trial court should have applied section 654 and stayed execution of the two-year sentence for the criminal street gang crime instead of imposing it concurrently to the sentence for the robbery. (See *People v. Hunt* (2011) 196 Cal.App.4th 811, 824 ["Defendant claims the sentencing court should have stayed the term for his active participation in a criminal street gang because it was based on the same intent he had when he participated in the robberies . . . . We agree"].)

8

III

*The Section 12021.5 Enhancement Can Stand*

On appeal, defendant argues, and the People agree, that there is insufficient evidence to support the section 12021.5 enhancement on count five. The parties reason that the jury hung on the gang offense and enhancements, and therefore there was insufficient evidence to establish the gang offense prong of section 12021.5. We disagree.

A. *Inconsistent Verdicts Can Stand*

Defendant's argument, though couched as one regarding sufficiency of the evidence, really boils down to taking the position that when the jury hung on the gang offenses and enhancements but found true the enhancement alleging defendant used a firearm during a gang offense it reached inconsistent conclusions. But, "an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both." (*People v. Santamaria* (1994) 8 Cal.4th 903, 911.) "When a jury renders inconsistent verdicts, 'it is unclear whose ox has been gored.' (*United States v. Powell[* (1984)] 469 U.S. [57,] 65 [83 L.Ed.2d [461,] 469].) The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . . .' (*Ibid.*) Because the defendant is given the benefit of the acquittal, 'it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted.' (*Id.* at p. 69 [83 L.Ed.2d at p. 471].)" (*People v. Santamaria* at p. 911.)

In the oft-cited *United States v. Powell, supra,* 469 U.S. at page 68, the U.S. Supreme Court addresses an argument that "an acquittal on a predicate offense

9

necessitates a finding of insufficient evidence on a compound felony count" by indicating the argument "simply misunderstands the nature of the inconsistent verdict problem. Whether presented as an insufficient evidence argument, or as an argument that the acquittal on the predicate offense should collaterally estop the Government on the compound offense, the argument necessarily assumes that the acquittal on the predicate offense was proper—the one the jury 'really meant.' This, of course, is not necessarily correct; all we know is that the verdicts are inconsistent."

Here, the only evidence either party considers in arguing that substantial evidence does not support the section 12021.5 enhancement finding is the fact that the jury hung on other gang allegations. But these inconsistent findings do not necessarily mean one or the other finding lacks substantial evidence.[2] As such, the parties' position on this issue lacks merit.

B. *We Apply the Substantial Evidence Test to the Actual Evidence*

Neither party described any of the evidence regarding the gang counts and enhancements in their briefs. In fact, treating his argument like a foregone conclusion and/or ignoring that a sufficiency of evidence claim regarding the section 12021.5 enhancement would require this court to consider gang evidence, defendant includes a footnote in his brief informing us that, "[b]ecause the jury deadlocked on the substantive

---

[2] Indeed, when the defendant entered a no contest plea to count four, the court addressed his attorney: "the factual basis for the 186.22(a), the trial in that matter . . . I believe would provide a sufficient factual basis. So unless there's anything further stated on that, I would accept the factual basis on that. ¶ Do you stipulate to that . . . ?" His attorney responded, "[y]es, Your Honor." Given (1) the section 186.22, subdivision (a), offense was rooted in the same set of facts as the conspiracy offense, and (2) the jury had found defendant carried a firearm during the conspiracy, the stipulation as to the facts supporting count four suggests there was sufficient evidence that the jury could find true the allegation that defendant was engaged in a gang offense and was armed with a firearm in the carrying out the conspiracy, i.e., that there was sufficient evidence to support a section 12021.5 finding.

gang offense (§ 182[, subd. ](a)) and the gang enhancements (§ 182[, subd.](b)(1)) as to all counts alleged against appellant (see 2[]CT 559), all of the gang-related evidence admitted at trial is excluded from this section for convenience." California Rules of Court, rule 8.204(a)(2)(C) requires an appellant to include a "summary of the significant facts" of a case "limited to matters in the record" in their opening brief. (See also Cal. Rules of Court, rule 8.360(a) [applying the requirements of rule 8.204 to briefs in criminal appeals].) When a party makes material omissions of critical facts in their opening brief, a court may waive consideration of related arguments. (See *Hjelm v. Prometheus Real Estate Group, Inc.* (2016) 3 Cal.App.5th 1155, 1166.) However, in the interest of justice, we review the evidence in the record related to this enhancement and make our determination based on the evidence.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

C.  *Elements of a Section 12021.5 Enhancement Using Section 186.22, Subdivision (b)*

Section 12021.5, subdivision (a), requires courts to impose a sentencing enhancement on, "[e]very person who carries a loaded or unloaded firearm on his or her person . . . during the commission or attempted commission of any street gang crimes described in subdivision (a) or (b) of Section 186.22."  The parties do not dispute, and there was substantial evidence in the form of testimony from Chavez and Miller, that Layton carried a firearm during the commission of the robbery he and his two codefendants conspired to commit.  Thus, the issue is whether there is substantial evidence to support a jury finding that the conspiracy to commit robbery was a street gang crime described in subdivision (a) or (b) of section 186.22.  We analyze this issue considering the elements of a section 186.22, subdivision (b)(1) offense.  Since we will conclude sufficient evidence supports a section 186.22, subdivision (b)(1) finding, we need not consider section 186.22, subdivision (a).  Moreover, in the trial court, defendant stipulated there was sufficient evidence to support the entry of a no contest plea on a section 186.22, subdivision (a) count.

Section 186.22, subdivision (b)(1), applies to persons who commit felonies (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members."  In turn, section 186.22, subdivision (f), defines a criminal street gang as, "any ongoing organization, association, or group of three or more persons . . . having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."  Subdivision (e), indicates that a "pattern of criminal gang activity" can be established by demonstrating "the commission of, attempted commission of, conspiracy

12

to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of" a list of enumerated offenses, "provided . . . the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Our Supreme Court summarized the factors that must be shown in order to find a person committed a section 186.22, subdivision (b)(1) crime— including the three prongs that must be satisfied to identify a criminal street gang—as follows:

"[T]he prosecution must prove that the crime for which the defendant was convicted had been 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1) . . . .) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol [prong one]; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute [prong two]; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period [prong 3]. (§ 186.22, subds. (e) and (f).)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley*).)

A court can rely on expert testimony to demonstrate the section 186.22, subdivision (b)(1) factors have been satisfied. (*Gardeley, supra,* 14 Cal.4th at p. 617.) An expert's opinion can be "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801, subd. (b).) The expert can also

render an opinion based on facts provided in a hypothetical, provided that hypothetical question is "rooted in facts shown by the evidence." (*Gardeley,* at p. 618.)

D. *Substantial Evidence Supports a Finding That the Robbery Was Committed "for the Benefit Of, at the Direction Of, or in Association with Any Criminal Street Gang"*

    1. *There Is Substantial Evidence That the West Roseville Norteños Are a Criminal Street Gang*

At trial, the People argued the gang with which the defendant was associated was the West Roseville Norteños (WRN). Officer Michael Sidebottom testified as an expert on gangs in general and on the activity of the Norteño criminal street gang in Placer County specifically. He described some of the history and structure of the Norteños, who serve as street soldiers for the Nuestra Familia prison gang. He discussed how the WRN would likely be part of the Norteño hierarchy that includes the greater Sacramento area, and identified influential people in the WRN. He identified various symbols associated with the Norteños—the number 14 and derivations of it, the color red, and the Northern Red Star. He indicated many gang members from the Roseville area get rose tattoos, and that flashing the "W" sign would be consistent with signifying the WRN. Sidebottom indicated that area Norteños typically engage in crimes of drug sales, witness intimidation, robberies, assaults, and shootings. He responded "yes" when asked if the area Norteño gang had more than three members and if they share a common symbol or sign.

Thus, based on the testimony of Officer Sidebottom, there was sufficient evidence for the jury to conclude—in satisfaction of prong one of the definition of a criminal street gang—that the WRN "is an ongoing association of three or more persons with a common name or common identifying sign or symbol," as contemplated by section 186.22, subdivision (f). (*Gardeley, supra,* 14 Cal.4th at p. 620 [indicating the expert evidence had satisfied all of the elements needs to establish a criminal street gang except prong

14

three].)  The association is the WRN, and its common identifying symbols include the color red, derivations of the number 14, the Northern Red Star, "W" signals, and rose tattoos.

Officer Sidebottom also provided sufficient evidence to satisfy prong two by demonstrating that one of the primary activities of the WRN is "the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e)."  (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324 ["Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute"].)  Specifically, based on Sidebottom's testimony a juror could reasonably have found that the WRN typically engage in drug sales (§ 186.22, subd. (e)(4)), witness intimidation (*id.* at subd. (e)(8)), robberies (*id.* at subd. (e)(2)), and assault (*id.* at subd. (e)(1)).  This testimony was buttressed by the testimony of officer Ken Nakamura, who indicated that assault-type crimes and shootings are typical of Norteños.

As to the third prong in the definition of "criminal street gang"—that the members "individually or collectively engage in, or have engaged in, a pattern of criminal gang activity" (§ 186.22, subd. (f))—Officer Sidebottom also opined that the area gang has a pattern of criminal activity.  Additionally, the People introduced evidence of two predicate crimes in which one or more WRN members and/or associates had been involved within three years of the commission of the robbery of Chavez.

- First, Dylan Sutton testified that on March 20, 2013, he arranged to purchase marijuana.  When he arrived to purchase the marijuana, he was "confronted and almost got jumped" but ran inside.  Later, he went around the corner with his housemates and saw the people who attacked him, and his attackers shot at him and his housemates.  Sutton identified the person who made this initial confrontation with him as Dylan Darling.  Officer Sidebottom testified it is his

15

opinion that Darling is a member of the WRN. The People also entered into evidence an abstract of judgment against Darling, showing the Placer County Superior Court found that, in attacking Sutton, Darling had committed assault with force likely to cause great bodily injury as defined by section 245, a section 186.22, subdivision (e)(1) offense.

- Second, Officer Christopher Trudell testified for the People regarding an incident that occurred on November 29, 2013. He responded to a call regarding what was believed to be a "large physical fight." He arrived to speak with a witness and a witness told him the persons suspected of instigating the fight had left. He inspected the believed location of the fight and found a door that appeared to be kicked in, and that was damaged to the point it could not be opened. Later, he learned officers had stopped the vehicle the suspects had fled the scene in, and he went to the traffic stop. He encountered six passengers, including Martinez. At least three of the individuals charged in association with the incident were convicted of a street gang crime as a result of the incident. Martinez was convicted of threats to commit crimes resulting in death or great bodily injury, as defined in section 422, a section 186.22, subdivision (e)(24) offense. Officer Michael Ryland, who testified as a gang expert to regarding the November 29, 2013, incident, stated he believed some of the participants, including Martinez, were gang members. As discussed in more detail below, there was sufficient evidence presented for the jury to conclude Martinez is a WRN member. On cross, Sidebottom agreed that he had formed an opinion that the November 2013 incident had been done in association with the WRN.

To summarize, sufficient evidence exists to support a finding that (1) the WRN is an association of three or more people that share a common name and common symbols; (2) one of the WRN's memberships primary activities is the commission of crimes enumerated in section 186.22, subdivision (e); and (3) WRN members committed two or

16

more 186.22, subdivision (e), offenses between March 13, 2011, and March 13, 2014, thereby establishing a pattern of criminal activity as defined by section 186.22. In short, there was substantial evidence to support the jury finding the WRN is a criminal street gang.

2. *There Is Substantial Evidence That the Conspiracy to Commit Robbery Was Done in Association with and for the Benefit of the WRN*

Substantial evidence supports a finding that defendant committed the robbery and participated in the conspiracy in association with or for the benefit of the WRN. A "jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) And substantial evidence supports that Martinez, Maravilla, and Layton are associated with or members of the WRN.

During his testimony, Officer Sidebottom reviewed various drawings found in Martinez's room which included a hand doing the "W" sign, which "WRN gang members throw . . . for West Roseville Norteños"; a Northern Star, which is "popular amongst Norteños"; and dice showing the numbers one and four, where 14 is "the number identifier for Norteños." He also reviewed Facebook photos of Martinez wearing red, the color associated with the Norteño criminal street gang; wearing San Francisco 49ers gear, which is often worn by Norteños because it includes red and the "SF" abbreviation can be seen as insulting their rival gang; associating with an individual who has known affiliations with the local Norteños; or making a "W" sign with his hand. Based on this and other evidence he reviewed, Sidebottom concluded that Martinez is a Norteño.

As to Maravilla, Sidebottom reviewed, among other things, a photo of Maravilla throwing a "N" with one hand and a "W" with the other, and standing next to Austin Benjamin—who Sidebottom identifies as "definitely an associate" of the WRN—who is

17

holding up one finger on one hand and four on the other. Sidebottom also testified that when he contacted Maravilla once, he saw Maravilla had a rose tattoo. An officer who investigated the March 20, 2013, crime committed by Darling and others testified that at the time of the crime, Darling was living with Maravilla, and a search of Maravilla's room at the time turned up red clothing and a hat with a "W" on it. Based on the evidence he reviewed, Sidebottom testified he believes Maravilla associates with the Norteños.

As to defendant, Officer Chad Baumann testified about phone calls he listened to that were made between defendant and someone named Robert Sanchez, who was living with defendant's sister. The conversation occurred on April 15, 2014, when defendant was in the county jail. During the telephone call, defendant and Sanchez discussed why in jail defendant was hanging out with the Woods—possibly a white gang, but maybe just the white population in jail—instead of the "Northerners." Defendant indicated there were more Woods than Northerners in jail, and he would have to get validated to be a Northerner. According to Baumann, Sanchez sounded disappointed that defendant was not sticking with the "brotherhood." The People also introduced letters written on a later date in which defendant appears to be describing the Nuestra Familia program hierarchy behind bars and its history, and he writes he wants to get a rose tattoo someday. He also describes having a chest tattoo that says "114%." Based on his review of the call and letters, Sidebottom opined that when defendant went into jail, he decided he would identify with the whites, because it was the safest option, but once he learned more about the system he was "able to keep a clean name and not be with the whites but be with the Norteños." An officer present during the search of defendant's residence testified they found "a higher than average amount of red clothing [¶] . . . [¶]. And [a] lack of any other color . . . , specifically a lack of blue clothing." They also found a flag of the Northern California Republic with a red star in the top left, 3.5 pairs of shoes that were "all red and black," a backpack with the words "Nor" and "Cal" on it separated by a star

18

colored in red, and that defendant had a tattoo of the state of California with a red star in the northern half of the state. Based on this evidence, and the evidence regarding Martinez and Maravilla, Sidebottom testified he believes this crime was committed by active participants in a criminal street gang, and that, in fact, the commission of the crime likely served as a means of bringing defendant into the gang.

Thus, sufficient evidence exists to find defendant committed the crime in association with WRN members, Maravilla and Martinez. Moreover, sufficient evidence exists to suggest that the commission of the crime benefited the WRN by increasing its numbers and status. (See *People v. Albillar* (2010) 51 Cal.4th 47, 63 [indicating increasing the status of gang members raises the general level of fear against the gang as a whole, which benefits the gang].)

3. *There Is Substantial Evidence That Defendant Committed the Conspiracy with the Specific Intent to Assist Criminal Conduct by Gang Members*

The evidence presented was sufficient to support a finding that Layton acted with the "specific intent to promote, further, or assist in any criminal conduct by gang members." (See § 186.22, subd. (b)(1).) "If substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar, supra,* 51 Cal.4th at p. 68.) In this case, defendant committed the offense with known gang members, Maravilla and Martinez.

## DISPOSITION

We affirm the jury's findings, but remand for resentencing consistent with this opinion in order to allow the trial court to exercise its discretion pursuant to section 12022.53. Upon resentencing, the two-year sentence for count four must be stayed pursuant to section 654 and not imposed as a concurrent sentence, and the abstract of

19

judgment on remand must reflect the stay.  Additionally, in issuing an updated abstract of judgment upon resentencing, we direct the trial court to correct item four of the abstract of judgment, filed on February 17, 2017, to reflect that the guilt finding on count four was the result of a plea and not a judgment by the jury.


_____

HULL, Acting P. J.


We concur:


_____

MAURO, J.


_____

MURRAY, J.


20